466 A.2d 991
COMMONWEALTH of Pennsylvania, Appellant,

v.

Stephen R. WOJDAK and Francis J. Lynch, Appellees.

Supreme Court of Pennsylvania.

Submitted Dec. 9, 1982.

Decided Oct. 18, 1983.

362

Eric B. Henson, Deputy Dist. Atty., Gaele McLaughlin Barthold, Asst. Dist. Atty., for appellant.

Donald J. Goldberg, Philadelphia, for appellee in No. 536.

Howard Gittis, Philadelphia, for appellee in No. 537.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

NIX, Justice.*

These are appeals of the Commonwealth, by allowance, from orders of the Superior Court, 270 Pa.Super. 554, 411 A.2d 1224, affirming orders of the Court of Common Pleas of Philadelphia which dismissed the criminal charges filed against appellee Francis J. Lynch, a state senator, and appellee Stephen R. Wojdak, a former state representative. The charges, which include bribery in official and political matters, attempted theft by extortion, attempted theft by deception, speculating or wagering on official action or information (attempted and actual), official oppression, and conspiracy, were contained in informations filed by the Attorney General of Pennsylvania following the issuance of presentments by a special investigating grand jury which had probed appellees' alleged involvement relating to the

* The instant matter was reassigned to this writer on June 29, 1983.

admission of a student to the School of Dentistry of Temple University. After a preliminary hearing, appellees were held for court.[1] On October 20, 1977 a petition for writ of habeas corpus was filed on behalf of both appellees. The matter was heard by Judge John E. Lavelle, specially presiding.[2] After argument Judge Lavelle determined that the evidence presented by the Commonwealth at the preliminary hearing failed to establish a *prima facie* case.

In this appeal the Commonwealth argues that the testimony presented against appellees did establish a *prima facie* case as to each of the crimes charged.[3] The premise of appellant's argument is that the evidence produced demonstrated appellees' participation in an alleged illegal scheme to obtain a sizeable monetary remuneration in return for their efforts. It is charged that the habeas court, and the Superior Court in the latter's affirmance, considered the Commonwealth's evidence "myopically and in 'bits' and 'pieces'." For the reasons that follow, we reverse in part and affirm in part the Order of the Superior Court.

## I.

The criminal charges in this matter relate to the alleged improper interference of appellees in the admittance of one Andrew Goldenberg to the dental school of Temple University in 1976. At the time pertinent to these charges appellees were both members of the General Assembly, appellee Lynch serving as a Senator and appellee Wojdak as a Representative. Dr. Donald Goldenberg, the father of Andrew, testified at the hearing that he had made numerous

1. The preliminary hearing court discharged appellees on charges of official oppression, 18 Pa.C.S. § 5301, and held them for trial on the remaining charges. The Commonwealth has not contested the dismissal of the official oppression charges.

2. Judge Lavelle was assigned by order of the Chief Justice pursuant to Pa.R.J.A. 701.

3. The Commonwealth has not suggested that it has available any additional evidence other than that presented at the preliminary hearing. They have based their argument solely upon the record of the preliminary hearing.

efforts to secure his son's admission to dental school at Temple University ("Temple"). Among the efforts was a promise to a Dr. Cook, an officer of Temple's Alumni Association, that Temple would receive a substantial contribution from Dr. Goldenberg if his son was successful in gaining admittance. After a number of months had passed without action on the application, Dr. Goldenberg contacted Samuel Biener ("Biener"). According to Dr. Goldenberg, Biener represented that he could be of assistance for a substantial sum of money. It was further understood that the money was not to be paid until the admission of Andrew was confirmed. At some later point, Biener requested and obtained from Dr. Goldenberg a transcript of the applicant's grades.

Dr. Goldenberg did not receive further word in connection with the matter until June 29, 1976, when Dr. Cook contacted him and advised that Andrew had been accepted. A short time thereafter Dr. Goldenberg received a second telephone call from Biener also indicating the situation looked favorable and suggesting it was as a result of his efforts. In an attempt to ascertain whether he was obligated to Dr. Cook or Biener for his son's admission, Dr. Goldenberg called Dr. Cook and was advised by Dr. Cook that Andrew had been admitted without any help. At or about 9:30 p.m. on June 29, 1976, Dr. Goldenberg called Biener and related to him the conversation with Dr. Cook. Within the next two days, Dr. Goldenberg again spoke with Biener wherein Biener told him to "forget about everything" and wished his son well. Dr. Goldenberg did not know either of the appellees or of their alleged involvement in the matter.

Biener testified that after initially speaking with Dr. Goldenberg he contacted appellee Lynch and told him of his conversations relating to Andrew's admission to Temple. He stated to Lynch, "I have got a boy that wants to get into dentistry and *I* can get ten thousand dollars" (emphasis added).[4] Lynch stated that he would "get back to [him]".

4. There was a discrepancy between the testimony of Dr. Goldenberg and Biener as to the anticipated amount to be paid to Biener. Dr.

About a month later Lynch contacted Biener and requested a transcript of Andrew's grades. It was stipulated that Lynch did not make any effort to secure the admission of Andrew. When Biener received a call from Dr. Goldenberg advising him of the successful admission,[5] he called Lynch and told him "let's forget about it". Lynch stated that he would "get back" to him. Later Lynch spoke with Biener and stated that an effort would be made to stop the letter acknowledging Andrew's admission. Two days after the above conversation Lynch notified Biener that he could not stop the letter and warned Biener to stay away from Dr. Goldenberg. There was no testimony from Biener that Lynch at any time asked for or discussed money for his assistance for any services he might provide. Biener further testified that he did not know Wojdak or of any participation by Wojdak in this matter.

Thomas Elliott, Temple University's Assistant Vice-President, offered testimony bearing upon the events that transpired after Dr. Goldenberg was verbally notified of his son's acceptance on June 29, 1976. He stated that he received a telephone call from Wojdak asking him to check on a dental school application of admission by an applicant named "Rosenberg". Elliott testified that he was accustomed to receiving recommendations, expressions of interest, and inquiries as to the status of applications for admissions from all segments of the community. He stated that it was his practice, whenever a legislator expressed interest, to inform the legislator as soon as action was taken, before notification was given to the applicant. His purpose was to afford the legislator the opportunity to be the first to give the news to the applicant's family.

Goldenberg testified that Biener had requested the sum of Fifteen Thousand ($15,000) Dollars.

5. Another conflict between Dr. Goldenberg's and Biener's versions of the events related to who made the telephone call between Dr. Goldenberg and Biener concerning the fact of admission. It was Biener's testimony that Dr. Goldenberg made the call to him wherein he (Biener) was first apprised of Andrew's admission.

After an investigation, Elliott found that there was no pending application by a person with the surname of Rosenberg. Wojdak then requested him to check for a "berg" that may have just been accepted. Elliott found the Goldenberg acceptance and relayed the information to Wojdak. Wojdak inquired whether the letter of acceptance had been sent out, and if not, whether it could be held up for a day. After further inquiry, Elliott learned that Temple had already sent the notification, and he relayed that information to Wojdak. Elliott further testified that prior to Wojdak's inquiries, which came after the admission decision, there was no expression of interest in the admission of Andrew by *any* member of the legislature.

It is also of significance that there was no direct evidence that Lynch spoke with Wojdak concerning the admission of Andrew.[6] The Commonwealth concedes that there is no evidence of Wojdak's knowledge of or involvement in the matter until after the June 29th call between Dr. Goldenberg and Biener, advising Biener of the acceptance. As previously stated, Dr. Goldenberg and Biener did not know nor did they have any contact with Wojdak.

## II.

At this juncture it is appropriate to set forth a summarization of the basic principles of law that must guide us in the instant analysis of the evidence presented. The Commonwealth bears the burden at a preliminary hearing of establishing at least a *prima facie* case that a crime has been committed and that the accused is probably the one who committed it. *Commonwealth v. Prado,* 481 Pa. 485, 393 A.2d 8 (1978); *Commonwealth v. Mullen,* 460 Pa. 336, 333 A.2d 755 (1975). To sustain that burden it is well settled that the Commonwealth must produce evidence,

6. The Commonwealth introduced certain telephone records which sought to establish the possibility of a communication between Wojdak and Lynch during this crucial period. This evidence, of course, did not establish the actual parties participating in these calls or the subject matter discussed.

such as to present "sufficient probable cause to believe that the person charged has committed the offense stated" (*United States v. Johns,* [4 U.S. (4 Dall.) 412, 413, 1 L.Ed. 888 (1806)]; in other words, it should make out a prima facie case of guilt. It should be such that if presented at the trial in court, *and accepted as true,* the judge would be warranted in allowing the case to go to the jury.

*Commonwealth ex rel. Scolio v. Hess,* 149 Pa.Super. 371, 374–75, 27 A.2d 705, 707 (1942) (Emphasis in original).

In the instant prosecution, the Commonwealth had sought to establish appellees' complicity by reliance upon circumstantial evidence. The use of inferences is a process of reasoning by which a fact or proposition sought to be established is deduced as the logical consequence from the existence of other facts that have been established. *See Commonwealth v. Whitman,* 199 Pa.Super. 631, 186 A.2d 632 (1950). *Accord, Commonwealth v. Gladden,* 226 Pa.Super. 13, 311 A.2d 711 (1973). An understanding of the nature of an inference thus is crucial to an evaluation of the sufficiency of the evidence under consideration.

An inference is no more than a logical tool enabling the trier of fact to proceed from one fact to another, if the trier believes that the weight of the evidence and the more experiential accuracy of the inference warrant so doing.

*Commonwealth v. Shaffer,* 447 Pa. 91, 105–06, 288 A.2d 727, 735–36, *cert. denied,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972). *Accord Commonwealth v. Mason,* 483 Pa. 409, 397 A.2d 408 (1979).

The test for reviewing statutory and common law inferences is well established:

Evidentiary inferences, like criminal presumptions, are constitutionally infirm unless the inferred fact is "more likely than not to flow from the proved fact on which it is made to depend." *Turner v. United States,* 396 U.S. 398 [90 S.Ct. 642, 24 L.Ed.2d 610] (1970); *Leary v. United States,* 395 U.S. 6 [89 S.Ct. 1532, 23 L.Ed.2d 57] (1969); *Commonwealth v. Shaffer,* 447 Pa. 91, 288 A.2d 727 (1972);

*Commonwealth v. Swiatkowski,* 446 Pa. 126, 285 A.2d 490 (1971); *Commonwealth v. Owens,* 441 Pa. 318, 271 A.2d 230 (1971). *Where the inference allowed is tenuously connected to the facts proved by the Commonwealth, due process is lacking.*
*Commonwealth v. McFarland,* 452 Pa. 435, 439, 308 A.2d 592, 594 (1973). (Emphasis supplied).

This "more-likely-than-not" test, which must be applied to inferences already enjoying judicial or legislative sanction, must be viewed as a minimum standard in assessing the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability. Anything less than such a standard would rise no higher than suspicion or conjecture which our law has repeatedly rejected as being a basis for a finding of a *prima facie* case. *See Commonwealth v. Prado, supra; cf. Commonwealth v. Hudson,* 489 Pa. 620, 414 A.2d 1381 (1980); *Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545 (1976); *Commonwealth v. Fields,* 460 Pa. 316, 333 A.2d 745 (1975); *Commonwealth v. Simpson,* 436 Pa. 459, 260 A.2d 751 (1970).

It also must be emphasized that the *prima facie* standard requires that the Commonwealth's evidence must establish that the crime has been committed. *Commonwealth v. Prado, supra; Commonwealth v. Mullen, supra; Commonwealth v. Devlin,* 294 Pa.Super. 470, 440 A.2d 562 (1982); *Commonwealth v. Beatty,* 281 Pa.Super. 85, 421 A.2d 1159 (1980); *Commonwealth v. Gordon,* 254 Pa.Super. 267, 385 A.2d 1013 (1978). To satisfy this requirement the evidence must show that the existence of each of the material elements of the charge is present. *See, e.g., Garabedian v. Superior Court,* 59 Cal.2d 124, 28 Cal.Rptr. 318, 378 P.2d 590 (1963); *People v. Treat,* 193 Colo. 570, 568 P.2d 473 (1977); *People v. Hodge,* 53 N.Y.2d 313, 441 N.Y.S.2d 231, 423 N.E.2d 1060 (1981); *State v. Olson,* 75 Wis.2d 575, 250 N.W.2d 12 (1977); *see also Commonwealth ex rel. Scolio v. Hess, supra.* While the weight and credibility of the evidence are not factors at this stage, and the Commonwealth need only demonstrate sufficient probable cause to believe

the person charged has committed the offense, the absence of evidence as to the existence of a material element is fatal. *See Commonwealth v. Prado, supra; Commonwealth ex rel. Scolio v. Hess, supra.* Thus where the Commonwealth's case relies solely upon a *tenuous inference* to establish a material element of the charge, it has failed to meet its burden of showing that the crime charged was committed. *Commonwealth v. Hudson; supra; Commonwealth v. Farquharson, supra; Commonwealth v. Fields, supra; Commonwealth v. Simpson, supra.*

### III.

Certain of the charges are so clearly inapplicable that an extended explication or an individual analysis of the facts as they relate to each of the appellees is unnecessary. We will first dispose of those charges before addressing the remaining offenses which require a fuller explanation.

■ The informations charging both appellees with speculating or wagering on official action or information, 18 Pa.C.S. § 5302, and the related counts charging a conspiracy and an attempt to commit that offense were clearly not established by the alleged scheme. An essential element of the crime of speculating or wagering on official action or information is the possession of confidential information which was obtained by virtue of the actor's official position. The only information in the scenario presented by the Commonwealth's evidence was the knowledge that Dr. Goldenberg's son was attempting to gain admission to Temple and subsequently that he had been admitted. Neither of these pieces of information were confidential items obtained by virtue of the appellees' office. Thus, the charges of speculating or wagering on official action or information, conspiracy and attempt to commit the substantive offense were properly dismissed.

■ Equally without any foundation in the evidence are the counts charging both appellees with attempted theft by extortion, 18 Pa.C.S. § 3923. The crucial missing element in

this instance is the absence of an extortive threat. The Commonwealth argues that this element is supplied by the testimony relating to the inquiry as to the possibility of temporary delay of the formal notice of acceptance. There was no intention to use a possible delay of the letter as an extortive threat to coerce Dr. Goldenberg into making a payment of money. To the contrary, it is evident that any actions relating to a delay in notification were never intended to be communicated to Dr. Goldenberg. Moreover, Dr. Goldenberg was not being coerced into making a payment; rather Dr. Goldenberg's only question was to whom his tender should be made.

## IV.

### Bribery in Official and Political Matters

Both Lynch and Wojdak were charged with a violation of 18 Pa.C.S. 4701. Section 4701(a) provides:

(a) Offenses defined.—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another or solicits, accepts or agrees to accept from another:

(1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;

(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or

(3) any benefit as consideration for a violation of a known legal duty as a public servant or party official.

From the briefs and oral argument of the Commonwealth it is apparent that the Commonwealth is urging that they have established that both Lynch and Wojdak have violated section 4701(a)(1).[7] The Commonwealth contends that they

7. Since there is no evidence of an improper "decision, vote, recommendation or other exercise of official discretion" relating to a

have established that Lynch agreed to use his influence in connection with the admission decision. Since it is stipulated that Lynch made no effort to interfere with the admission decision and that Wojdak was not involved until after the admission decision, the only conceivable basis for sustaining this charge must depend upon evidence that Lynch agreed to exercise the alleged improper influence. Specifically as to Wojdak, his culpability under this section is premised upon an assertion that he acted to promote, facilitate and/or aid in an undefined general scheme of Lynch.

■ The deficiency in the Commonwealth's proofs as to Wojdak is instantly apparent. The concession that he was not involved until after the admission decision had in fact been made is fatal to the Commonwealth's position. Under the Commonwealth's own theory, any intention on the part of Lynch to provide a favorable recommendation for the action was abandoned. Their theory would have us believe at that point there was no longer an intent to influence the decision, the heart of the bribery theory, but rather the direction had changed to one of deception. Any evidence relating to Wojdak's belated participation would not go to the charge of bribery which was no longer involved at the time of the commencement of his participation, but would relate to any subsequent offenses that may have been committed in the efforts to salvage the alleged scheme.

Here, once the admission decision had been made favorably, there was no longer any suggestion of an intent to in any way influence that decision. The theory of the Commonwealth at that point is that the scheme changed to take advantage of that decision but not to interfere with or disturb it. The offense of bribery was germane only to the alleged earlier efforts or anticipated efforts by Lynch to influence a favorable decision. The heart of a conspiracy is the shared criminal intent of the participants in that conspir-

"judicial administrative or legislative proceeding", subsection 2 of section 4701 is clearly inapplicable. Similarly, there is no suggestion of an attempt to violate "a known legal duty as a public servant or party official". Thus subsection 3 is likewise inapplicable.

acy. *Commonwealth v. Schomaker,* 501 Pa. 404, 461 A.2d 1220 (1983); *Commonwealth v. Horner,* 497 Pa. 565, 442 A.2d 682 (1982); *Commonwealth v. Tate,* 485 Pa. 180, 401 A.2d 353 (1979); *Commonwealth v. Bradley,* 481 Pa. 223, 392 A.2d 688 (1978); *Commonwealth v. Menginie,* 477 Pa. 156, 383 A.2d 870 (1978); *Commonwealth v. Farquharson, supra; Commonwealth v. Cox,* 466 Pa. 582, 353 A.2d 844 (1976); *Commonwealth v. Wilson,* 449 Pa. 235, 296 A.2d 719 (1972). Accepting the Commonwealth's theory, Wojdak never shared in an intent for Lynch to improperly influence the decision itself.

Analysis also demonstrates the insufficiency of the Commonwealth's evidence offered to establish Lynch's culpability under section 4701(a)(1). The Commonwealth first concedes and then attempts to ignore its stipulation that Lynch did in fact make no effort to influence the admission decision. They argue that under the language of the statute the actual making of the recommendation is not necessary if the party agrees to make the improper recommendation.

■ The question, however, is whether or not the evidence presented at the preliminary hearing in fact established that Lynch had agreed to make the recommendation. The testimony indicates that when Lynch was told of Dr. Goldenberg's willingness to pay for the admission of his son his only statement was "I will get back to you." This is certainly not a definitive agreement to provide the solicited recommendation. Thus, their conduct must be looked at to determine whether in fact such an agreement was ever made. The Commonwealth stresses his subsequent request for the transcript and ignores the admitted fact that no recommendation was made nor any other action taken by Lynch to evidence an agreement to assist in securing the admission.[8] The request for the transcript alone was insufficient as a matter of law to overcome the inference that would flow from the fact that he did not take any steps to seek the young man's admission. Such a request is consistent with one who is yet

8. In later conversation Lynch inquired as to the applicant's first name.

to make the judgment as to whether to agree to give a recommendation.

It is of course to be hoped that public officials would immediately and unequivocally reject any offer that would have the slightest appearance of involving a breach of trust. However, a charge under a specific criminal statute requires competent evidence establishing each of its elements. Under this section a material element is the requirement that the offender did at least agree. Thus, although we may disapprove of the behavior, we cannot ignore the absence of proof of a vital element of the offense charged.

To fully appreciate the fundamental flaw in the Commonwealth's case it is necessary to stress that we are not here called upon to pass upon the institution's admission policies. Our role is confined to a determination as to whether a *prima facie* case has been established as to the violation of the criminal statutes that have been charged. The core of the bribery charge is the alleged improper agreement by a member of the legislature to give a recommendation in consideration for a pecuniary benefit. Dr. Goldenberg's willingness to gain his son's admission through the payment of money and Biener's willingness to help in consideration for a fee do not amount to criminal conduct. A legislator, as well as any other concerned citizen, could offer a recommendation without offending the statute here involved. The criminality under the provisions of this section of the Crimes Code flows from a legislator's giving a recommendation or agreeing to give a recommendation in consideration for a pecuniary benefit.[9]

Thus there was no criminality in Dr. Goldenberg's offer to pay Biener for his help or Biener's agreement to provide that help. Therefore, prior to Lynch's association with the transaction it was not criminal in nature. Nor did the mere

---

9. Although a possible violation of the Code of Ethics for the General Assembly was not raised, it may well be that the legislature will enact laws concerning the admissions policies of educational institutions receiving financial support through legislative appropriations and to define the extent to which legislators may be involved in the admissions process of such institutions.

association of Lynch change it into a criminal confederacy. It was therefore incumbent upon the Commonwealth to establish that there was something about the nature of Lynch's participation that transformed the enterprise into a criminal one. This they failed to do.

The Commonwealth insists that they have established a connection between Biener and Lynch in this overall transaction. With that we agree. Specifically, what the Commonwealth failed to show is the conduct on the part of Lynch in his participation upon which the offenses charged could be predicated. His mere participation in an otherwise legal undertaking cannot support the inferences of illegality they urge us to draw. Thus their failure to show that Lynch did in fact agree to give the recommendation is fatal.

## V.

### Theft by Deception and Related Charges

Both appellees were also charged with an attempted violation of section 3922. Section 3922 provides:

(a) Offense defined.—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise:

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

(b) Exception.—The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

The Commonwealth's argument as to the sufficiency of their evidence as to these charges is premised upon the assumption of a conspiratorial relationship between Biener, Lynch and Wojdak. As we have stated the undertaking of Biener was not at its inception a criminal one. The mere participation of Lynch in that arrangement, without more, did not make it a criminal conspiracy. The evidence produced by the Commonwealth as to the activities preceding Temple's decision to admit Andrew failed to establish the criminal behavior. In determining whether these offenses have been established, it must be seen whether their evidence establishes a change in the activities which would constitute the violations here charged.

At this stage the evidence of the Commonwealth comes closer to approaching criminal conduct, but the question still remains whether a substantial step was made which would support a finding of an attempt.

When Biener advised Lynch that Andrew had been admitted and accused Lynch of doing nothing to assist in the admission of Andrew, Lynch simply responded by saying he would "get back" to him. Biener had stated in that conversation that the matter should be dropped. Shortly thereafter Lynch again spoke with Biener and stated that an effort would be made to delay the notification. The Commonwealth also introduced evidence of Wojdak's inquiry as to the possibility of withholding the notice and that he was advised that the notification had been sent. After the activities of Wojdak, Lynch notified Biener that the notification could not be stopped and warned Biener against further contact with Dr. Goldenberg.

From this evidence the Commonwealth contends that a scheme developed at that point to create a false impression in the mind of Dr. Goldenberg as to the status of his son's application in an effort to convince him that Biener's intervention was crucial to the ultimate successful admission. They argue that Wojdak's action can properly be imputed to the efforts of Lynch and Biener because of the relationship

that existed between Lynch and Wojdak,[10] the fact that there was the possibility of a communication within the critical time frame, *see* note 6, *supra,* and Wojdak's otherwise unexplained interest in the matter. We will defer at this juncture a discussion of Wojdak's relationship to Lynch and Biener because we are of the view that it is clear, in any event, that the evidence fails to establish a criminal attempt.

The commentary to section 5.01 of the Model Penal Code, from which section 901, 18 Pa.C.S. § 901, is derived, *see* Joint State Government Commission of the General Assembly, Comment to § 901 (1967), *reprinted in* S. Toll, *Pennsylvania Crimes Code Annotated* (1974) at 217, provides a useful synthesis of the case law in this area:

> In crimes such as bribery, extortion and obtaining money by false pretenses, where communication of a culpable message is an essential element of the offense, an attempt is generally found where the actor has gone so far that he believes his conduct is sufficient to convey all or part of that message to his contemplated victim.
>
> . . . .
>
> . . . . This approach has been followed and attempts found in a number of situations: (1) where the misrepresentation is complete and is the last act; (2) where the misrepresentation is complete (in the sense that no new misrepresentations need be made) but further acts are required; (3) where the misrepresentation is incomplete and further misrepresentations are required in order to complete the crime. *On the other hand, when no misrepresentations have been made, it is clear that there is no attempt,* even if contact has been made with the contemplated victim through inquiries by the actor.

Model Penal Code § 5.01 comment at 62–64 (Tentative Draft No. 10 1960) (emphasis supplied; footnotes omitted).

 It is clear that section 3922 has as an essential element the creation of the false impression.[11] There was no

10. It was stipulated that Lynch and Wojdak shared a Harrisburg apartment with two other individuals.

11. Section 3922 is also derived from the Model Penal Code.

transmission of false information to Dr. Goldenberg as to his son's status after the decision to admit had been made. Under the Commonwealth's evidence, viewed in its most favorable light, there was not even an effort to convey to Dr. Goldenberg false information about the admission decision. At best what is here presented amounted to no more than an inquiry as to the feasibility of delaying the notification. Even under traditional common law formulation, such conduct does not reach the level of an attempt. *See Commonwealth v. Clopton,* 447 Pa. 1, 289 A.2d 455 (1972); *Commonwealth v. Ellis,* 349 Pa. 402, 37 A.2d 504 (1944); *Commonwealth v. Eagan,* 190 Pa. 10, 42 A. 374 (1899). In *Commonwealth v. Eagan, supra,* this Court set forth the common law definition of an attempt:

An attempt, in general, is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of complete accomplishment of it. In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution. *So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent and do not amount to attempts.*

*Id.,* 190 Pa. at 21–22, 42 A. at 377 (emphasis supplied)

■ The final question to be resolved is whether or not either or both of the appellees can properly be charged on this evidence with a conspiracy to commit a theft by deception. The fact that the conduct did not constitute a substantial step does not necessarily decide the question as to whether there was in fact a criminal agreement and an overt act in furtherance thereof. *See* 18 Pa.C.S. § 903. Although the evidence of the Commonwealth is far from overwhelming it does appear that there is evidence which would permit the inference that Lynch and Biener conceived the scheme and agreed to create a false impression in the mind of Dr. Goldenberg as to the status of his son's applica-

tion. The purpose of creating this misconception was to obtain the monies promised to Biener. The overt act required under section 903(e) is satisfied by the enlistment of Wojdak to aid in accomplishing the conspiratorial design. His telephone calls of inquiry would also be considered overt acts in furtherance of the conspiracy. Although the evidence is fragile, in view of the stage of the proceedings at this point we conclude that it was sufficient to satisfy the burden of a *prima facie* case.

■ We do not, however, believe that the Commonwealth has established that Wojdak had the requisite shared intention to justify sustaining these charges against him. Although the evidence can possibly justify that Wojdak made the inquiry at the behest of Lynch, there is no evidence from which to infer that Wojdak knew the objective sought to be achieved by Lynch in seeking the delay or that his reason for assisting was inspired by a criminal motive. Given Temple's established practice of permitting legislators to personally notify successful applicants in which they have expressed an interest, Wojdak's willingness to make the inquiry cannot be characterized as unlawful conduct from which criminal intent could properly be inferred.

## VI.

For the foregoing reasons it is apparent that the Commonwealth's evidence failed to establish any type of a conspiratorial relationship involving the appellees herein prior to the favorable admission decision by Temple. They have also failed to establish former Representative Wojdak's complicity as to any of the alleged charges. We do, however, find that a *prima facie* case has been established as to Lynch relating to the charge of conspiracy (with Biener) to commit theft by deception.

Accordingly, the Order of the Superior Court affirming the dismissal of the count charging Senator Lynch with Conspiracy to Commit Theft by Deception is reversed and the said count is reinstated. The Order of the Superior Court as to all of the remaining counts is affirmed.

380

## ORDER

The Court being equally divided as to No. 1428 charging appellee Lynch with the crime of attempted theft by deception, the order of the Superior Court as to this count is affirmed.

LARSEN, J., concurs in the result.

ROBERTS, C.J., filed a concurring and dissenting opinion in which McDERMOTT, J., joins.

HUTCHINSON, J., filed a concurring and dissenting opinion.

FLAHERTY, J., did not participate in the decision of this case.

ROBERTS, Chief Justice, concurring and dissenting.

[1, 7] The majority's order denying the Commonwealth its right to proceed to trial against appellee Francis J. Lynch, a state senator, and appellee Stephen R. Wojdak, a former state representative, on criminal charges of bribery in official and political matters, attempted theft by extortion, attempted theft by deception and conspiracy, compels dissent. As was determined by the judge who heard the evidence presented at the preliminary hearing, these charges, which were filed by the Attorney General of Pennsylvania in 1976 following the issuance of presentments by a special investigating grand jury, were amply supported by the Commonwealth's evidence. That evidence showed that Lynch first agreed to accept from an intermediary a substantial sum of money—as much as $10,000—in exchange for a promise by Lynch to exercise his influence in order to obtain the admission of an applicant to the School of Dentistry of Temple University, a state-funded educational institution, and that Lynch then enlisted Wojdak's aid to halt the normal flow of the admission by securing a "hold" on the Dental School's letter of admission to the applicant.

I

Lynch and Wojdak were held for court on the above charges of political corruption after a preliminary hearing before Judge Gates (Lebanon County, specially presiding). The charges were later dismissed by Judge Lavelle (Schuylkill County, specially presiding), who, after argument on petitions for writs of habeas corpus, determined that the evidence presented by the Commonwealth at the preliminary hearing failed to establish a prima facie case. A panel of the Superior Court affirmed the dismissal of the charges and a majority of this Court now affirms the dismissal of all but one of the charges brought against Lynch, conspiracy commit theft by deception, and the dismissal of all of the charges brought against Wojdak.[1]

The Commonwealth's case against Lynch and Wojdak as presented at the preliminary hearing was based on the testimony of three witnesses, Dr. Goldenberg, the father of the applicant, Samuel Biener, a local politician, and Thomas Elliott, a lobbyist for the University and its Vice-President for Governmental Affairs. Dr. Goldenberg admitted at the preliminary hearing that he had agreed to pay Biener $15,000 in cash upon the admission of his son to the Dental School. Biener admitted at the same hearing that he had approached Lynch concerning the agreement between himself and Dr. Goldenberg. He told of his conversation with Lynch concerning the status of the application of Dr. Goldenberg's son, including a conversation in which Lynch revealed the existence of an effort to "stop" the letter of admission which the Dental School had independently decided to mail to the applicant. Elliott described in detail how

1. The Commonwealth also charged Lynch and Wojdak with official oppression, 18 Pa.C.S. § 5301, and speculating or wagering on official action or information (attempted and actual), 18 Pa.C.S. § 5302. Judge Gates dismissed the charges of official oppression at the close of the preliminary hearing, a ruling which the Commonwealth has not contested. As to the charges of speculating or wagering on official action or information, it cannot be said on this record that Lynch and Wojdak either attempted to rely or actually relied on "information to which [they had] access in [their] official capacity...." 18 Pa.C.S. § 5302.

he had been asked by Wojdak if the Dental School's letter to Dr. Goldenberg's son formally announcing the son's admission could be "held," the unique nature of that inquiry, and Wojdak's reaction upon learning that the letter of admission had already been mailed. Because the opinion dismissing the charges fails to consider the full testimony of these witnesses, it is necessary to set forth this testimony, especially the testimony of Thomas Elliott, which not only implicated Wojdak in the scheme but also established the Commonwealth's contention that Wojdak and Lynch had a shared criminal intent.

Dr. Goldenberg testified that he had made a number of efforts to secure his son's admission to the Dental School after the fall of 1975, when his son had applied. Among the efforts was a promise to a Dr. Cook, an officer of the University's Alumni Association whom Dr. Goldenberg described as very influential, that the Dental School would be the beneficiary of a substantial contribution from Dr. Goldenberg if his son should be admitted.

Sometime in the spring of 1976, while waiting to hear from the Dental School, Dr. Goldenberg contacted Samuel Biener. According to Dr. Goldenberg, Biener represented that he "could help," but that it would cost Dr. Goldenberg $15,000. Biener's own testimony confirmed Dr. Goldenberg's account: "I said you've got to have cash, no check and he asked me, you would protect me and I said you don't give no money up until you get a letter of acceptance."

Biener testified that he had contacted Lynch after advising Dr. Goldenberg of the cost of Biener's help. Biener told Lynch, "I have got a boy that wants to get into dentistry and I can get Ten Thousand Dollars" ($5,000 less than the cost of Biener's help as Biener had presented it to Dr. Goldenberg). Lynch then said that he would "get back" to Biener. A few weeks later, Lynch directed Biener to obtain a transcript of "the boy's marks."

Dr. Cook, the alumni association officer whose assistance Dr. Goldenberg had sought, unofficially advised Dr. Goldenberg on the morning of June 29, 1976, that his son had been

admitted to the Dental School and that an official letter of admission from the Dental School would be forthcoming. Dr. Goldenberg testified that shortly thereafter he was also advised of his son's admission by Biener and told by Biener "to get the package ready." According to Dr. Goldenberg, the receipt of the information regarding the admission from both sources had placed him in a "dilemma": "Here I was obligated to give money to the school and also to give money to Mr. Biener and at this point, I didn't know what to do." That same evening Dr. Goldenberg called Biener to tell him of Dr. Cook's independent efforts to assist his son's admission. Dr. Goldenberg testified, "[Biener] swore to me that my son got in without any help, not even from him...." Nothing was said in that conversation regarding Dr. Goldenberg's payment of money to Biener. According to Dr. Goldenberg, either the "next day or the second day," Biener called Dr. Goldenberg and confirmed that the admission had occurred "without any help." Biener told Goldenberg to "forget about it."

Biener maintained that he learned of the admission of Dr. Goldenberg's son during a telephone conversation with Dr. Goldenberg. According to Biener, in that same conversation Biener congratulated Dr. Goldenberg, told him to "forget about everything," and then called Lynch and told him that "the boy got in on his own, you didn't do nothing. Let's forget about it...." Lynch "didn't say nothing on that particular call," but called Biener back and said, "They are going to try and stop the letter."

Two days later, on July 1, 1976, Lynch called Biener again. Lynch advised Biener that "they couldn't stop the letter." In that same conversation, Lynch advised Biener to "stay away" from Dr. Goldenberg, and added, "You are going to get boxed in." [2]

2. The parties stipulated that neither Lynch nor Wojdak had actually assisted in the admission of Dr. Goldenberg's son. The parties also stipulated that Lynch and Wojdak were members of the General Assembly for the duration of the alleged scheme, and that they shared a Harrisburg apartment.

Thomas Elliott, the University's lobbyist, testified that on June 30, 1976, the day after Dr. Goldenberg had unofficially learned of his son's admission and the day before Lynch's statement that "they couldn't stop the letter," Wojdak had called Elliott, asking him to "check on a Dental School application" of a "Rosenberg," who would have been admitted "in the last couple of days." Elliott then placed a call to a Mr. Sullivan, a University official who handled dental school admissions. After checking school records, Sullivan told Elliott that no person named Rosenberg had been recently admitted. Elliott then called Wojdak, who asked Elliott to check again, this time to see if any person whose name ended in "-berg" had been admitted. Elliott did so, and Sullivan found the name "Goldenberg." Elliott then called Wojdak, who asked Elliott if the letter of admission had gone out. After Elliott said that he would have to check, Wojdak requested, "If it has not gone out, could it be held for a day?"

Elliott followed up on Wojdak's request by placing another call to Sullivan. Sullivan learned that the letter had already been signed and had been mailed. Elliott relayed this information to Wojdak, who said, "They are trying to go around me," a statement of record by Wojdak which the opinion dismissing the charges of political corruption fails to consider.

On cross-examination, Elliott testified that he frequently received recommendations, expressions of interest, and inquiries as to the status of applications for admission, from "all segments of the community," including Wojdak and other legislators. However, on redirect examination, he testified that he had never previously been asked to "hold" a letter of admission:

"Q. [(By the prosecuting attorney)]: In the course of your dealings as Vice-President of Governmental Affairs, would it be fair to say that you get hundreds or thousands of inquiries?

A. [(By Elliott)]: Yes.

Q. What was your position?

A. I was Undergraduate Director of Admissions.

Q. And in that position, you had often inquiries about [the] status of certain candidates, is that correct?

A. That's correct.

Q. In all of those dealings, all of the dealings you have had throughout the years, in both of those positions, did anyone ever ask you to see if a letter could be held up?

A. No."

This testimony is also not considered by the opinion dismissing the charges.

## II

The above testimony of record, far from supporting the assertion that Wojdak was unaware of Lynch's scheme, amply supports the inference urged by the Commonwealth that Wojdak's effort to have the letter "held" was undertaken pursuant to a plan with Lynch, whose objectives Wojdak shared. Elliott's testimony established that on June 30, 1976, one day after Lynch had advised Samuel Biener that "they are going to try and stop the letter," Elliott had received an inquiry from Wojdak regarding the possibility of having the formal letter of admission "held." Clearly Wojdak was the "they" to whom Lynch had referred. In all of Elliott's dealings with persons interested in the status of applications for admission, including Wojdak himself, Elliott had never previously been asked if he could hold a letter of admission. Elliott further testified that after he had informed Wojdak that the letter of admission could not be held, Wojdak made the statement that "they are trying to go around me." Surely a factfinder could reasonably conclude on the evidence presented that the utterance of Wojdak was an expression of frustration over the fact that others had in fact circumvented his and Lynch's scheme to exercise control over the admission of Andrew Goldenberg, a scheme which had fallen through despite Wojdak's last-ditch effort to salvage it by "holding" the Dental School's letter of admission.

In light of all the testimony, particularly the testimony of Thomas Elliott, there is no basis on the record for immunizing Wojdak from prosecution on the charge of conspiracy to commit theft by deception, the one charge brought against Lynch which is permitted to stand. The Commonwealth has presented evidence which would permit a factfinder to conclude that Wojdak was a participant in Lynch's scheme, and the Commonwealth should thus be afforded an opportunity to establish the guilt of both Lynch and Wojdak at trial.

Similarly, when the conduct of Lynch is considered in conjunction with that of Wojdak, it is clear that the Commonwealth has established a prima facie case against both defendants on the charges of attempted theft by extortion, 18 Pa.C.S. § 3923, and attempted theft by deception, 18 Pa.C.S. § 3922. Under 18 Pa.C.S. § 3923, "[a] person is guilty of theft [by extortion] if he intentionally obtains or withholds property of another by threatening to: * * * (4) take or withhold action as an official or cause an official to take or withhold action. * * * " Here, the testimony relating to the joint effort of Lynch and Wojdak to have the letter held would permit a factfinder to conclude that Lynch and Wojdak were laying the groundwork necessary to assure that Dr. Goldenberg would pay Biener, a "substantial step toward the commission of [theft by extortion]," 18 Pa.C.S. § 901(a). Under 18 Pa.C.S. § 3922, "[a] person is guilty of theft [by deception] if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind. . . . " On the basis of the evidence presented by the Commonwealth, a factfinder could reasonably conclude that during the alleged scheme, Lynch and Wojdak sought to create a false impression that the admission of Dr. Goldenberg's son would flow from political influence, a false impression initially created by Lynch, who in fact did nothing to influence University officials, and subsequently reinforced by Wojdak, who unsuccessfully at-

tempted to have the Dental School's letter of admission "held."

There is also no basis on the record for the view expressed in the opinion dismissing the charges that the transaction between Dr. Goldenberg and Biener "[did] not amount to criminal conduct," a premise employed by that opinion to defeat the charge of bribery in official and political matters, 18 Pa.C.S. § 4701. The evidence at the preliminary hearing established that Dr. Goldenberg had agreed to pay Biener $15,000 in cash upon the admission of his son to the Dental School. From this evidence a factfinder could reasonably conclude that Dr. Goldenberg and Biener had agreed that Biener was to purchase the exercise of influence from whomever Biener saw fit to contact. A factfinder could also reasonably conclude that Lynch must have realized, upon being told by Biener that Biener could "get $10,000" from Dr. Goldenberg, that the $10,000 was intended not to be compensation for the services of Biener alone, but rather compensation for Biener plus "pecuniary benefit" for Lynch "as consideration for [his] recommendation...," 18 Pa.C.S. § 4701, if he should make one.

Under 18 Pa.C.S. § 4701, "[a] person is guilty of bribery, a felony of the third degree, if he ... agrees to accept from another: (1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official, or voter by the recipient...." Here, after being told that Biener could "get $10,000" from the parent of an applicant, Lynch requested "the boy's marks," and never disclaimed an interest in the large sum of cash. Upon learning that Andrew Goldenberg had been admitted to the School of Dentistry "on his own," Biener promptly contacted Lynch and charged Lynch with having "done nothing" to facilitate the admission, and told Lynch, "Let's forget about it," a proposal that their agreement be dropped. Once so confronted by Biener, Lynch made no effort to dispute Biener's apparent understanding, but rather told Biener that "they are going to try and stop the letter." From Wojdak's subsequent conduct it

may. be fairly inferred that Lynch promptly enlisted the aid of Wojdak to "stop" the letter. See 18 Pa.C.S. § 306(b)(3) (accomplice liability). It is apparent that a factfinder could properly determine that these measures were Lynch's means of rejecting Biener's proposal to "forget about" the agreement which Biener had understood to exist, and Lynch's further means of enabling him to perform pursuant to that same agreement.[3]

## III

As in all other cases in which persons have been properly charged with having engaged in criminal conduct, here the Commonwealth is entitled to prove the guilt of Lynch and Wojdak on the charges of bribery in official and political matters, attempted theft by extortion, attempted theft by deception, and related counts of conspiracy at a trial, where Lynch and Wojdak would have the same opportunity to defend against the charges as do all other persons charged with criminal conduct. Fair and even-handed administration of criminal justice permits nothing less.

3. The arrangement alleged between Biener and Lynch bears a curious resemblance to the arrangement alleged in *United States v. Fineman*, 434 F.Supp. 189 (E.D.Pa.1977), which was summarized as follows:

"On four occasions between September 1970 and March 1973 the defendant [ (Herbert Fineman, a former state representative) ] and [Martin] Abrams [ (a committeeman from Philadelphia) ] carried out a scheme or arrangement pursuant to which the parents of students wishing to enroll in certain graduate schools within the Commonwealth of Pennsylvania (two medical schools and a veterinary school, all of which received substantial financial support through legislative appropriations) were induced by Abrams to pay large sums of money (ranging from $11,000 to $15,000 per student) in order to influence favorable action upon their respective applications. Abrams did not tell the parents the identity of the person whose influence would thus be obtained. The defendant, through letters and otherwise, would recommend favorable action on the applications by the graduate school involved. After the student was accepted, most of the money collected by Abrams was turned over to the defendant and retained by him."

434 F.Supp. at 192. The alleged conduct of Fineman was held to have constituted bribery at common law, 434 F.Supp. at 194, and to be within the Crimes Code's definition of bribery, id.

Accordingly, the orders of the Superior Court should be reversed insofar as they affirm the orders of the Court of Common Pleas of Philadelphia dismissing the above charges, and the orders of the preliminary hearing judge holding Lynch and Wojdak for court on the above charges should be reinstated.

McDERMOTT, J., joins in this opinion.

HUTCHINSON, Justice, concurring and dissenting.

[1–4, 7, 8] Based on the currently accepted analysis of the meaning of a *prima facie* case, correctly set forth by the majority, I join it in affirming Common Pleas' dismissal of all criminal charges against appellee Wojdak. I also join in its affirmance of the dismissal of the counts against appellee Lynch charging him with bribery in official and political matters, attempted theft by extortion and speculating or wagering on official action or information (attempted and actual) and official oppression.

Moreover, although I agree with the majority that the Commonwealth established as to appellee Lynch a *prima facie* case of conspiracy to commit theft by deception I am troubled by its holding that the Commonwealth at the preliminary hearing must present evidence which if accepted as true would warrant a judge in allowing the case to go to the jury. Majority opinion at 7–8 (citing *Commonwealth ex rel. Scolio v. Hess,* 149 Pa.Superior Ct. 371, 27 A.2d 705 [1942]). I believe the proper function of a preliminary hearing is for the Commonwealth to establish "sufficient probable cause that the accused has committed the offense." *See Commonwealth v. Prado,* 481 Pa. 485, 393 A.2d 8 (1978). It is apparent from examination of Pa.R.Crim.P. 141 that the purpose of the preliminary hearing is to provide the opportunity for the accused to confront witnesses against him, introduce his own witnesses and, for the first time, challenge the Commonwealth's assertion that there is "probable cause" to justify holding him for trial. Moreover, it is unreasonable to require the Commonwealth to present a case sufficient to survive a demurrer at trial at a preliminary

hearing which must be held three to ten days after preliminary arraignment. Pa.R.Crim.P. 140.

On the majority's analysis, however, I do not believe the Commonwealth has established "probable cause" on the charges against appellee Wojdak or on the charges related to bribery, extortion, or speculating or wagering on official action or information against appellee Lynch. However, I am not prepared to concede that presentation of only the evidence now before us would necessarily withstand a demurrer, although I realize that is the traditional verbal standard for determining whether a *prima facie* case has been made out.

Finally, I dissent from that portion of the majority's opinion that affirms the dismissal of the charge of attempt to commit theft by deception against appellee Lynch.

Consistent with its definition of what constitutes a *prima facie* case, the majority holds that the Commonwealth's evidence, viewed in its most favorable light, fails to show an effort to convey to Dr. Goldenberg false information about his son's admission and that at best the evidence showed no more than an inquiry as to the feasibility of delaying the notification. Majority opinion at 1001. This analysis of the evidence omits an inference, permissible under all the circumstances of this case, that appellee Lynch contacted appellee Wojdak and asked him to try to get the school to delay sending an acceptance letter to Dr. Goldenberg's son.[1]

I believe that evidence of such conduct established "probable cause," as that term is defined by the majority, on the attempt charge under Section 901 of our Crimes Code, 18 Pa.C.S. § 901, because appellee Lynch's communication with Biener and his efforts to delay the acceptance letter are, when viewed on the whole record, "substantial step[s] toward the commission of the crime" of theft by deception.

1. *See* majority opinion at 1002. The majority correctly concludes, "there is no evidence from which to infer that Wojdak knew Lynch's objective in seeking the delay or that the reason for his assisting was inspired by a criminal motive."

In a prosecution for attempt to commit theft by deception under 18 Pa.C.S. § 3922 [2] I would not, as the majority does, adopt the requirement for attempt to commit theft by false pretenses described in the comment to the Model Penal Code § 501, at p. 63 (tentative draft 10, 1958). Under that standard an actor has not completed an attempt to commit theft by false pretenses unless "the actor has gone so far as to convey all or part of a [culpable] message to his contemplated victim." An absolute requirement that the actor actually convey the culpable message to the contemplated victim is inconsistent with the definition of attempt in Section 501 of the Model Penal Code and Section 901 of the Crimes Code.

One of the purposes of Section 501 of the Model Penal Code and Section 901 of our Crimes Code is to extend the law of criminal attempts "by drawing the line between attempt and non-criminal preparation further away from

**2.** 18 Pa.C.S. § 3922(a) which defines the offense of theft by deception provides:

(a) Offense defined.—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

(2) prevents another from acquiring information which would affect his judgment of a transaction; or

(3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

That provision of the Crimes Code replaced 18 P.S. § 4836 which provides that:

Whoever, by any false pretense, obtains the signature of any person to any written instrument, or obtains from any other person any chattel, money, or valuable security, with intent to cheat and defraud any person of the same, or being an officer, manager, agent, employe of or in any way interested in any person, by false pretense, knowingly and with intent to defraud, procures, obtains, or aids, assists, or abets in obtaining from any other person, any chattels, moneys, or valuable securities for such person of which he is an officer, manager, agent, employe or in which he is in any way interested, is guilty of a felony, . . . .

the final act." Comment, Model Penal Code, Article 5, *supra,* at 25.

In furtherance of that purpose, Section 901 of our Crimes Code defines attempt in terms of engaging in conduct which constitutes a "substantial step" towards commission of a crime.[3]

As Superior Court correctly stated in *Commonwealth v. Gilliam,* 273 Pa.Superior Ct. 586, 589–90, 417 A.2d 1203, 1205 (1980):

> With the adoption of the Crimes Code, however, the legislature devised a new test for attempt. Thus, in Section 901(a), 18 Pa.C.S. § 901(a), an attempt is defined as follows:
>
> > "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime."
>
> See: *Commonwealth v. Howard,* 248 Pa.Super. 246, 375 A.2d 79 (1977). The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before actual commission of the crime. See: Toll, Pennsylvania Crimes Code Annotated, 217 (1974); White, *The Inchoate Crimes Provisions of the New Pennsylvania Penal Code,* 35 Pitt.L.Rev. 235, 237–42 (1973).

In the instant case a jury could infer that appellee Lynch's efforts to delay the acceptance letter were an attempt to

---

**3.** Section 501 of the Model Penal Code defines criminal attempt as:

(1) Definition of Attempt. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

. . . .

(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

Section 901(a) similarly defines criminal attempt:

(a) Definition of attempt.—A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime.

create the false impression that he and Biener were responsible for Goldenberg's son's admission and that Goldenberg was obligated to pay them for their services.

I would therefore find probable cause to hold appellee Lynch on the charge of attempt to commit theft by deception.