J-A26038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
     :        PENNSYLVANIA
           Appellant      :
     :
     :
              v.      :
     :
     :
RICARDO DUPLESSIS      :    No. 2601 EDA 2021

Appeal from the Order Entered November 17, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0007098-2021

BEFORE:  BOWES, J., KING, J., and PELLEGRINI, J.[*]

DISSENTING MEMORANDUM BY PELLEGRINI, J.:      **FILED MARCH 3, 2023**

The central issue here is whether, at a preliminary hearing, the sole witness established a *prima facie* case of Appellee's guilt.  Although the witness initially identified Appellee in a surveillance video based on his walk, clothing and demeanor, she essentially recanted those reasons on cross-examination.  Because the identification amounted to conjecture, I would affirm the trial court's ruling that the Commonwealth failed to make out a *prima facie* case.

**I.**

Alphonzo Anderson (the decedent) was shot and killed at 1109 Rosalie Street in Philadelphia County.  Appellee was arrested in connection with the

_____

[*] Retired Senior Judge assigned to the Superior Court.

shooting and was charged with first-degree murder (18 Pa.C.S. § 2502), carrying a firearm without a license (18 Pa.C.S. § 6106), carrying a firearm in public (18 Pa.C.S. § 6108), and possession of an instrument of crime (18 Pa.C.S. § 907).

At the preliminary hearing held in 2021, the Commonwealth called Marquita Grasty (Grasty) as the only testifying witness. Grasty stated that she and Appellee had known each other since 2011, having dated sporadically for several years. Grasty gave birth to their child in 2017, and the relationship ended permanently in 2019. Prior to that time, since 2016, Grasty had been romantically involved with the decedent and Appellee was aware of that fact.

On the evening in question, Grasty arranged for a Lyft to pick up the decedent and bring him to her home. At about 10:00 p.m. that night, Grasty accidentally texted the Lyft information to Appellee. In response, Appellee texted Grasty to ask if she would speak with him on the phone. Grasty declined, explaining to him in a text message that the decedent would be arriving at her home shortly. In the final text message Appellee sent Grasty that evening, he indicated that "he was going for a walk" and Grasty did not respond.

At about 11:00 p.m., the decedent arrived at Grasty's home and he remained there for a few hours until he left to sleep in Grasty's Honda Accord that was parked in the rear alley of her home. Grasty explained that the

decedent was too tired to go back to his own residence and Grasty's mother would not permit the decedent to stay in her home overnight.

When the decedent left to sleep in the car, Grasty retired to her bedroom for the evening. Grasty woke up later that night to the sound of gunshots and texted the decedent to check on him. Grasty assumed that the decedent was still asleep when he did not respond. At about 7:00 a.m. the next morning, Grasty walked outside to find the decedent in her car, covered in blood due to fatal bullet wounds in his face and neck.

Because there were no eyewitnesses, the Commonwealth attempted to link Appellee to the shooting by having him identified in a composite of surveillance videos presented at the preliminary hearing. The surveillance videos showed an individual walking down Summerdale Avenue toward the alley where Grasty's vehicle was parked in the minutes preceding the shooting. An individual clad in black can be seen peering into Grasty's vehicle and removing a firearm from his jacket pocket. The individual then walked to the other side of the alley, out of view of the surveillance cameras, and reappeared a few minutes later. Upon returning to the alley, the individual walked toward the car and opened fire, shooting the decedent in the head at about 5:45 a.m. on the morning in question. The videos conclude with the

individual running out of the alley and at no point could his face be seen clearly.[1]

Grasty had been shown some of the videos during an initial interview with the homicide unit, and while on the stand, Grasty had the benefit of additional angles that she had not yet seen. While viewing the videos, Grasty identified Appellee as the shooter. She explained that she could recognize him in the videos based on the way he walked and the type of clothing he usually wore. She stated further that it was rare for anyone to go to the back alley behind her home where her car was parked. However, Grasty testified that Appellee was familiar with that part of the property, that he lived nearby, and that he knew her Honda Accord was often parked in the alley behind her home.

Additionally, Grasty attested to Appellee's history of violence, recounting that once in 2019, he had choked her as well as keeping a firearm hidden in his basement ceiling. She mentioned further that Appellee had once sent her a letter in which he wrote that he saw the decedent's face when he was choking her.

_____

[1] The perpetrator appeared to be wearing a hood over his head throughout the recordings, and the overall quality of the surveillance videos is dark and grainy. It is not discussed in the testimony, but the videos show that at all relevant times the perpetrator seemed to have his face covered by an N-95 mask.

Grasty's cross-examination was crucial to the trial court's ultimate decision. When asked basic questions about how Appellee could be identified from the video images, she all but recanted by stating that there was no rational way to do so. That is, Grasty testified that there was nothing unique about Appellee's gait to make it distinct or identifiable; nor was the person in the videos wearing any clothing that would be specific to an item in Appellee's wardrobe:

> **Defense counsel**: When the video was on the screen and we can see a person walking and you identified him as [Appellee], your testimony was his clothing was one of the things you [used to identify him], correct?
>
> **Grasty**: Yes.
>
> **Defense counsel**: You would agree with me from what we can tell from the video, the person in the video is wearing a black outfit, correct?
>
> **Grasty**: Uh-huh, yes.
>
> **Defense counsel**: There was nothing peculiar or specific about the outfit that you could see in the video, correct?
>
> **Grasty**: Correct.
>
> **Defense counsel**: You can't tell who made it, whether it's Nike, Adidas, you know, Gucci, you can't tell, right?
>
> **Grasty**: No.
>
> **Defense counsel**: Okay. And that goes for the entire wardrobe from head to toe, correct?
>
> **Grasty**: Yes.
>
> **Defense counsel**: You said multiple times that you thought it was [Appellee'] because of his walk, correct?

**Grasty**: Yes.

**Defense counsel**: Okay. [Appellee] had any injury that you're aware of that affected his legs or his walk, did he?

**Grasty**: No.

**Defense counsel**: Okay. And was there anything in that video in terms of the walk that you can point to specifically that made it unique to [Appellee]?

**Grasty**: No.

Preliminary Hearing Transcript, 8/9/2021, at pp. 39-40.

At the conclusion of the preliminary hearing held on August 9, 2021, the trial court found that the Commonwealth had presented sufficient evidence to establish a *prima facie* case that Appellee had committed the charged offenses. However, subsequently, on November 17, 2021, Appellee moved to quash the charges on the ground that no competent evidence had been presented establishing his identity as the decedent's killer. The trial court granted the motion to quash the charges on that ground and the Commonwealth timely appealed.

The majority reverses the trial court's order because Grasty had known Appellee for years, was familiar with his appearance and demeanor, and "believed" that he was the individual in the video, that one could infer, under the totality of the circumstances, that he was responsible for the shooting. *See* Majority Opinion, at p. 11. Because that conclusion is directly against Grasty's testimony quoted above, I respectfully dissent.

**II.**

The Commonwealth argues on appeal that Grasty's initial identification was sufficient to establish a *prima facie* case. In response, Appellee contends that it was proper for the trial court to disregard testimony presented at a preliminary hearing where it is "patently incredible" or simply too unreliable to qualify as competent evidence of guilt. **See** Appellee's Brief, at 8 (quoting **Liciaga v. Court of Common Pleas of Lehigh County**, 566 A.2d 246, 251 (Pa. 1989) (Larsen, J., concurring)).[2]

Our Supreme Court has recently given the following summary of the relevant evidentiary standards necessary to make out a *prima facie* case at a preliminary hearing:

> The basic principles of law with respect to the purpose of a preliminary hearing are well established. The preliminary hearing is not a trial. The principal function of a preliminary hearing is to protect an individual's right against an unlawful arrest and detention . . . . At this hearing the Commonwealth bears the burden of establishing at least a *prima facie* case that a crime has been committed and that the accused is **probably** the one who committed it.
>
> **Commonwealth v. McBride**, 528 Pa. 153, 595 A.2d 589, 591 (1991) (citation omitted) (emphasis added).
>
> "[A] *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged

---

[2] The evidentiary sufficiency of the Commonwealth's *prima facie* case for a charged crime is a question of law for which our standard of review is *de novo* and our scope of review is plenary. **See Commonwealth v. Wroten**, 257 A.3d 734, 742 (Pa. Super. 2021) (citation omitted).

and establishes probable cause to warrant the belief that the accused committed the offense. Furthermore, the evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury." [***Commonwealth v. Karetny***, 880 A.2d 505, 514 (Pa. 2005)] (citations omitted). "A judge at a preliminary hearing is not required, nor is he authorized to determine the guilt or innocence of an accused; his sole function is to determine whether probable cause exists to require an accused to stand trial on the charges contained in the complaint." ***McBride***, 595 A.2d at 592. An offense on which the Commonwealth has met its burden will be "held over" for trial, ***Commonwealth v. Weigle***, 997 A.2d 306, 311 (2010); at the trial, of course, the Commonwealth's burden is to establish guilt beyond a reasonable doubt. ***McBride***, 595 A.2d at 591. The weight and credibility of the evidence are not factors at the preliminary hearing stage, and **the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense**. ***Commonwealth v. Wojdak***, 466 A.2d 991, 997 (Pa. 1983) (plurality).

"[I]nferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." [***Commonwealth v. Huggins***, 836 A.2d 862, 866 (Pa. 2003)] (quotation marks omitted). "The use of inferences is a process of reasoning by which a fact or proposition sought to be established is deduced as the logical consequence from the existence of other facts that have been established." ***Wojdak***, 466 A.2d at 996.

**The "more-likely-than-not" test must be applied to assess the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability. The more-likely-than-not test is the minimum standard — anything less rises no higher than suspicion or conjecture**.

***Commonwealth v. Perez***, 249 A.3d 1092, 1102-03 (Pa. 2021) (some citations omitted, emphases added).

In the present case, the "more-likely-than-not" test had to be applied because Grasty's identification of Appellee was ostensibly based on inferences

- 8 -

from the surrounding circumstances of the shooting. *See id*. The trial court's job, then, was to assess the reasonableness of those inferences and determine whether Grasty's testimony was "deduced as a logical consequence" of established facts. *See id*.

At the preliminary hearing, Grasty admitted that she could not see the face of the perpetrator in the surveillance videos shown to her; nor could she articulate *any* characteristics of the gait, clothing or demeanor of the perpetrator that could be used to identify him as Appellee. *See* Preliminary Hearing Transcript, 8/9/2021, at pp. 39-40. Far from weighing evidence or making an impermissible credibility determination, the trial court merely took the witness at her word when she stated that nothing in the surveillance video could be used to identify Appellee as the shooter. *Id*.[3]

The majority ignores this portion of Grasty's testimony despite it being the lynchpin of the trial court's ruling.[4] Regardless, the fact remains that when reviewing Grasty's testimony in its entirety, no practical difference can be discerned between her "identification" and her unsubstantiated *belief* that

---

[3] It is implicit from the parties' respective arguments and the majority's analysis that a finding of probable cause would have to hinge on the viability of Grasty's identification of Appellee in the surveillance video.

[4] *See* Trial Court Opinion, 3/17/2022, at 9 ("Although circumstantial evidence may create a logical connection as to [Appellee's] motive, the witness identification based solely on her relationship with [Appellee] in the absence of further corroborating evidence, is insufficient to establish that [he] is responsible for the killing.").

Appellee killed the decedent. Grasty's testimony at the preliminary hearing, therefore, rose no higher than suspicion or conjecture which the trial court was free to reject. **See Perez**, 249 A.3d at 1103.

Accordingly, I dissent from the majority's decision to reverse the trial court's order quashing the charges.