J-A20035-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| BRADY COLLIN DISTEFANO | : | |
| | : | |
| | : | No. 1785 WDA 2017 |

Appeal from the Order Entered November 9, 2017
in the Court of Common Pleas of Indiana County,
Criminal Division at No(s): CP-32-CR-0000416-2017

BEFORE: BENDER, P.J.E., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED OCTOBER 18, 2018**

The Commonwealth of Pennsylvania appeals from the Order granting the pretrial Petition for Writ of *Habeas Corpus* (hereinafter "the *Habeas Corpus* Petition") filed by Brady Collin DiStefano ("DiStefano"), and dismissing the criminal charges against DiStefano. We affirm in part and reverse in part, and remand for further proceedings.

At approximately 11:00 p.m. on Friday, February 3, 2017, DiStefano and two of his fraternity brothers at the Indiana University of Pennsylvania, Trevor King ("King") and Caleb Zweig ("Zweig"),[1] left a house party, located on Wayne Avenue in Indiana, to walk back to their respective homes. **See** N.T. (preliminary hearing), 4/16/17, at 3-6, 25-26. King's testimony at the preliminary hearing established the following. King, Zweig, and DiStefano had all consumed alcohol during the evening. **Id.** at 4-5, 7, 22-24. DiStefano was

_____

[1] DiStefano was 19 years old at the time, and Zweig was 20 years old.

"pretty intoxicated at the time and [exhibited] slurred speech[.]" *Id.* at 7. King stated that Zweig "was also intoxicated but … not nearly as bad[,]" *i.e.*, as DiStefano. *Id.* While the three young men were walking on the sidewalk, King was approximately ten feet in front of DiStefano and Zweig. *Id.* at 26-27. King then heard DiStefano and Zweig "bickering a little bit" and "arguing about something[.]" *Id.* at 6, 27.

King described what next transpired as follows:

> I heard them bickering and I turned around and they were [] in each other's face and like what guys do [*sic*,] and they had their chests puffed out a little bit[,] and [] not really harming each other[,] [] just poking each other. I said to quit it and turned around and kept walking. And I watched for a few more seconds and I heard a scuffle[,] or heard something that got my attention[,] and I turned back around and I saw [that Zweig] was on his back[, *i.e.*, on the sidewalk,] and [DiStefano] [] had his back toward me and was kneeling over top of [Zweig.[2]]
>
> * * *
>
> [DiStefano] was on top [of Zweig]. [DiStefano's] knees were on the pavement but his hands were on [Zweig's] chest area and I didn't really see. I didn't take time to assess the situation[,] and I ran up and separated the two. And I threw [DiStefano] off of [Zweig].

*Id.* at 7-8 (footnote added, questions by the prosecutor and some paragraph breaks omitted). King stated that DiStefano did not resist when King physically removed DiStefano from Zweig. *Id.* at 9, 32; *but see also id.* at 31-32 (wherein King stated that "it was pretty forceful[,] like I yanked

---

[2] King further explained that DiStefano was "in between [Zweig's] legs almost. [DiStefano's] knees were not on top of [Zweig,] but [DiStefano] was leaning over [Zweig.]" N.T., 4/16/17, at 28.

[DiStefano] off of [Zweig].").  Notably, King stated that he did not see how Zweig had fallen to the sidewalk.  *Id.* at 27-28.

King acknowledged that, in his police report, he had stated that he saw DiStefano's "hands [] up around [Zweig's] neck or chest area[, but] I wasn't really sure."  *Id.* at 9.  On cross-examination, King stated that DiStefano's "hands were on [Zweig,] but I don't know if [DiStefano] was choking him or not[,] and [DiStefano's hands] were up here in this area[,]" (*i.e.*, King demonstratively motioned to his neck area).  *Id.* at 28.  King agreed that it was "just seconds before [King] turned around[, *i.e.*, upon hearing the scuffle,] that [King] went over and [] helped, [and] pulled [DiStefano] off[.]"  *Id.* at 31.  King stated that "the longest time that I guess [DiStefano] could have had his hands on [Zweig] was like five or six seconds tops."  *Id.*

King testified that the following transpired after he "threw [DiStefano] off of" Zweig:

> So[,] immediately there was probably like two or three people that came around.  [Zweig] was on his back on the sidewalk[,] and so I knelt down and I picked him up so [that] he was sitting up[,] and made sure he was still breathing [] okay[.]  [] I didn't check his pulse or anything but he was visibly breathing and his chest was rising and falling[,] and some weird noises [were] coming from his throat.  So I just thought that he was okay enough[,] so I just held him up there.  And then at that time[,] … [the] three [other students who] … came from across the street [] were helping me.

*Id.* at 9; *see also id.* at 36 (wherein King stated that Zweig was "groaning at the time and moaning.").  King explained that although Zweig was breathing at this time, he was unconscious.  *Id.* at 10.  King and three other individuals

- 3 -

then picked Zweig up, carried him a few feet to lay him on the grass, and positioned him on his side. *Id.* at 34-35. Someone called 911, and an ambulance was dispatched to the scene. *Id.* at 11, 35.

After the ambulance arrived, King looked around to locate DiStefano but could not find him. *Id.* at 11-12. Accordingly, King began to walk back to the house that was hosting the house party in an attempt to locate DiStefano, and spotted him trying to re-enter the house from the rear stairs. *Id.* at 12. King stated that the residents of the house would not permit DiStefano to enter because the police had been called. *Id.* King said that he would assist DiStefano to get back home, as he was significantly intoxicated. *Id.* at 13. King testified that he noticed DiStefano had sustained a scrape to the side of his head, but King did not know how this had occurred. *Id.* at 12, 30. King eventually got DiStefano back to DiStefano's apartment, at which time King left and walked to his own apartment. *Id.* at 14.

In the meantime, the ambulance rushed Zweig to the emergency room at the Indiana Regional Medical Center. *Id.* at 76. However, despite lifesaving efforts by medical professionals, Zweig died shortly after arriving. *Id.* Zweig's body was then released to the Indiana County Coroner's Office for an autopsy. *Id.*

The police officer who had received the initial dispatch on the night of the incident, Detective John Scherf ("Detective Scherf") of the Indiana Borough Police Department, also testified at the preliminary hearing. Detective Scherf stated that shortly after Zweig's death, he conducted

interviews of potential witnesses that night. *Id.* at 76-77. On the morning after the incident, Detective Scherf interviewed King at the police station, and King gave a written and verbal statement. *Id.* at 78, 15-16.

The trial court described what transpired after Detective Scherf had conducted his interviews.[3]

> [Detective Scherf] proceeded to [DiStefano's] apartment to investigate. When Detective Scherf arrived at [DiStefano's] apartment in the early morning hours of February 4, 2017, a female answered the door, indicated [that DiStefano] was sleeping inside, and that he had been injured in a fight with someone named Caleb. Detective Scherf then applied for and was issued a search warrant for [DiStefano's] apartment and cellular phone[,] as well as a warrant for [DiStefano's] person. Shortly thereafter, [DiStefano] was transported to the Indiana Borough Police Station to be interviewed. [DiStefano] was later charged with aggravated assault[4] and[,] after the receipt of Zweig's autopsy results, with criminal homicide.[5]

Trial Court Opinion and Order, 11/13/17, at 1-2 (footnotes added, some capitalization omitted).

The forensic pathologist who performed the autopsy on Zweig, Ashley Zezulak, M.D. ("Dr. Zezulak"), also testified at the preliminary hearing. The trial court summarized Dr. Zezulak's testimony as follows:

> When asked if she was able to render an opinion on the cause of death, she replied, "[s]omewhat of an opinion. More from an investigative standpoint[,] seeing that I didn't find any significant

---

[3] The trial court derived its factual recitation from the Affidavit of Probable Cause.

[4] 18 Pa.C.S.A. § 2702(a)(1).

[5] *Id.* § 2501(a).

- 5 -

anatomical findings during the autopsy." ([N.T., 4/16/17,] at 51[]). Dr. Zezulak stated that[, in her autopsy report,] she indicated [Zweig's] cause of death[6] was, "[a]sphyxiation, secondary to presumed chokehold and chest compression." ([*Id.*] at 52[; *see also id.* at 53-54 (wherein Dr. Zezulak explained that "[i]t is not uncommon for us to have cases where we do not have any certain anatomic findings[,] when we work with the police and the coroners and the story evolves. It is more of what we call a diagnosis of exclusion.")]). She stated that the only trauma she found was a scalp hemorrhage, but that it was not large enough to have caused [Zweig's] death, and she found no evidence consistent with a chokehold or chest compression. [*Id.* at 57-58.[7]] She further testified that there was nothing medically or pathologically consistent with a mechanical strangulation, asphyxiation, chest compression, or chokehold. ([*Id.*] at 74[]). In a case where a chokehold is applied, Dr. Zezulak opined that it would probably take five to ten seconds to lose consciousness, ([*id.*] at 71[]), and within minutes[,] irreversible brain damage would occur. ([*Id.*]).

When asked about how she arrived at her opinion, Dr. Zezulak indicated that she had relied on information given to her by Jerry Overman [("Overman")], the Indiana County Coroner. ([*Id.*] at 66[]). According to Overman, [Dr. Zezulak recounted, Zweig] had been found unresponsive after a physical assault. ([*Id.*] at 67[]). Dr. Zezulak admitted that she based her opinion of the cause of death **solely** on what she had been told by investigators. ([*Id.*] at 57). When asked about any supporting findings used in her opinion, she stated, "[f]or sure I have no physical evidence." ([*Id.*] at 62[]).

_____

[6] Dr. Zezulak stated that, based on her autopsy, Zweig "was in perfect physical health" prior to his death. N.T., 4/16/17, at 50; **but see also id.** at 68 (wherein Dr. Zezulak conceded on cross-examination that she had not received any information that would "involve any pre-existing medical conditions relative to [] Zweig.").

[7] However, Dr. Zezulak additionally stated that "signs do not always have to be present for chokeholds or chest compressions." N.T., 4/16/17, at 58.

Trial Court Opinion and Order, 11/13/17, at 3-4 (footnotes and emphasis added).

At the conclusion of the preliminary hearing,[8] the Magisterial District Judge found that the Commonwealth had established a *prima facie* case for criminal homicide and aggravated assault, and therefore bound the charges over for court.

On September 1, 2017, DiStefano filed the *Habeas Corpus* Petition,[9] asserting therein that both charges against him must be dismissed because the Commonwealth had failed to present sufficient evidence to establish a *prima facie* case. The Commonwealth filed a Brief in opposition to DiStefano's Petition, after which the trial court conducted a hearing on the matter on October 3, 2017. By an Order entered on November 9, 2017 (hereinafter "the *Habeas Corpus* Order"), the trial court granted the *Habeas Corpus* Petition and dismissed both charges. The Commonwealth then timely filed a Notice of Appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

The Commonwealth now presents the following issue for our review:

> Whether the trial court erred as a matter of law in granting [DiStefano's] Motion for *Habeas Corpus*[,] when the trial court ruled that the Commonwealth failed to establish its *prima facie*

---

[8] No other witnesses testified at the preliminary hearing aside from King, Detective Scherf, and Dr. Zezulak. The only exhibit introduced at the hearing was Dr. Zezulak's autopsy report.

[9] DiStefano also filed a Motion to suppress his statements made to the police, which is not relevant to the instant appeal.

case with regard to the charges of criminal homicide and aggravated assault[,] and the trial court weighed the evidence and examined the credibility of witnesses[?]

Brief for the Commonwealth at 5 (some capitalization omitted).

"A pre-trial *habeas corpus* motion is the proper means for testing whether the Commonwealth has sufficient evidence to establish a *prima facie* case." **Commonwealth v. Dantzler**, 135 A.3d 1109, 1112 (Pa. Super. 2016). This Court has explained that

[a] *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. The Commonwealth need not prove the defendant's guilt beyond a reasonable doubt. Rather[,] the Commonwealth must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury. In determining the presence or absence of a *prima facie* case, inferences reasonably drawn from the evidence of record that would support a verdict of guilty are to be given effect, but suspicion and conjecture are not evidence and are unacceptable as such.

**Commonwealth v. Starry**, 2018 PA Super 266, at *12 (Pa. Super. 2018) (citation omitted); **see also id.** at *8 (stating that "the Commonwealth can establish a *prima facie* case by wholly circumstantial evidence." (citation omitted)). "To demonstrate that a *prima facie* case exists, the Commonwealth must produce evidence of every material element of the charged offense(s)[,] as well as the defendant's complicity therein. To meet its burden, the Commonwealth may utilize the evidence presented at the preliminary hearing

and also may submit additional proof."[10]   ***Dantzler***, 135 A.3d at 1112

(citations and quotation marks omitted)).   Additionally, our Pennsylvania

Supreme Court has explained that "where the Commonwealth's case relies

solely upon a *tenuous inference* to establish a material element of the charge,

it has failed to meet its burden of showing that the crime charged was

committed."   ***Commonwealth v. Wojdak***, 466 A.2d 991, 997 (Pa. 1983)

(emphasis in original).

Our standard of review is as follows:  "When reviewing a trial court's

decision to grant a *habeas corpus* petition, we will not reverse the trial court's

decision absent a manifest abuse of discretion."  ***Commonwealth v. Ruby***,

838 A.2d 786, 788 (Pa. Super. 2003) (citation omitted).   "[T]he

Commonwealth's *prima facie* case for a charged crime is a question of law[,]

as to which an appellate court's review is plenary."  ***Dantzler***, 135 A.3d at

1112 (citation omitted).

The Crimes Code defines criminal homicide as follows:  "A person is

guilty of criminal homicide if he intentionally, knowingly, recklessly or

negligently causes the death of another human being."   18 Pa.C.S.A.

§ 2501(a).  "Causation is an essential element of the offense of homicide  ….

Tort theory of causation, the proximate cause, is insufficient to impose

---

[10] In the instant appeal, the Commonwealth did not submit any proof in addition to the evidence adduced at DiStefano's preliminary hearing.

criminal responsibility." ***Commonwealth v. Cheatham***, 615 A.2d 802, 805

(Pa. Super. 1992) (internal citation omitted).

The Crimes Code defines aggravated assault, in relevant part, as follows:

**§ 2702. Aggravated assault.**

**(a) Offense defined. —** A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S.A. § 2702(a)(1). "Serious bodily injury" is defined as "[b]odily

injury which creates a substantial risk of death or which causes serious,

permanent disfigurement, or protracted loss or impairment of the function of

any bodily member or organ." ***Id.*** § 2301. Additionally,

[w]here the victim suffers serious bodily injury, the Commonwealth is not required to prove specific intent. The Commonwealth need only prove the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life. For the degree of recklessness contained in the aggravated assault statute to occur, the offensive act must be performed under circumstances which almost assure that injury or death will ensue.

***Commonwealth v. Patrick***, 933 A.2d 1043, 1046 (Pa. Super. 2007) (*en*

*banc*) (emphasis, citations, brackets, and paragraph breaks omitted).

We will first address whether the trial court properly determined that

the Commonwealth failed to establish a *prima facie* case of criminal homicide.

In support of its ruling, the trial court stated in its Opinion and Order as

follows:

To be guilty of criminal homicide as defined by statute, one must have caused the death of another human being. In this matter, [Dr. Zezulak] admitted that there is no physical evidence to support the finding of the cause of [Zweig's] death. Additionally, there is no evidence from the eyewitness, King, that [DiStefano] choked Zweig[,] or that King was even aware of how Zweig ended up on the ground. Furthermore, King testified that he pulled [DiStefano] from Zweig within five or six seconds at the most[,] and there was no struggle between himself and [DiStefano] when he did so. Absent any evidence indicating the cause of Zweig's death or that [DiStefano had] acted in a manner so as to asphyxiate Zweig, there is nothing to show that [DiStefano] caused the death of another human being.

Trial Court Opinion and Order, 11/13/17, at 4-5.

The Commonwealth counters that the evidence presented at the preliminary hearing was sufficient for a *prima facie* showing that DiStefano caused Zweig's death. *See* Brief for the Commonwealth at 37-45. The Commonwealth points out that Dr. Zezulak opined that the cause of death was asphyxiation. *Id.* at 40. The Commonwealth further emphasizes that "Dr. Zezulak [] testified that '[anatomical findings] don't always have to be present, signs do not always have to be present for chokeholds or chest compressions.'" *Id.* at 40-41 (quoting N.T., 4/16/17, at 57-58). According to the Commonwealth,

because there were no other indicators to explain why an otherwise healthy [20]-year-old male suddenly died following a physical altercation with [DiStefano,] wherein [Zweig] was made unconscious, Dr. Zezulak was able to use a technique she described as a "diagnosis of exclusion"[11] to determine his cause

_____

[11] *See* N.T., 4/16/17, at 53-54 (wherein Dr. Zezulak testified that "[i]t is not uncommon for us to have cases where we do not have any certain anatomic findings[,] when we work with the police and the coroners and the story evolves. It is more of what we call a diagnosis of exclusion.").

- 11 -

of death as asphyxiation. … [I]t is clear that [Dr. Zezulak] followed the appropriate and arguably only available method to determine such a cause of death.

Brief for the Commonwealth at 42-43 (footnote added). The Commonwealth contends that the trial court failed to (1) consider Dr. Zezulak's foregoing testimony; and (2) view it in the light most favorable to the Commonwealth, as it was required to do. *Id.* at 43; *see also id.* at 49-50 (asserting that "the trial court essentially required the Commonwealth to prove beyond a reasonable doubt that [DiStefano] committed the crimes charged.").

Additionally, the Commonwealth argues that "the lower court erroneously made credibility determinations regarding [] King and Dr. Zezulak's testimony as to the facts surrounding [Zweig's] death[,] as well as the medical finding regarding the cause of death." *Id.* at 45; *see also id.* at 23 (pointing out that this Court has held that "it is inappropriate for [a] trial court to make credibility determinations in deciding whether the Commonwealth established a *prima facie* case[.]" *Id.* at 23 (quoting *Commonwealth v. Landis*, 48 A.3d 432, 448 (Pa. Super. 2012) (*en banc*))).

We conclude that even viewing the evidence, and all reasonable inferences to be derived therefrom, in a light most favorable to the Commonwealth, the Commonwealth failed to establish a *prima facie* case of criminal homicide. In so holding, the following testimony adduced at the preliminary hearing is particularly noteworthy. Dr. Zezulak admitted that she had based her opinion of Zweig's cause of death **solely** upon what she had been told by the police concerning Zweig's altercation with DiStefano. N.T.,

4/16/17, at 57; *see also id.* at 65 (wherein Dr. Zezulak agreed with the statement that "without the information provided to [her] by the police, [she] wouldn't be able to give any finding of [Zweig's] cause of death that would be based on pathological or medical independent findings."]).  Additionally, Dr. Zezulak stated that her opinion as to the cause of death being "[a]sphyxiation, secondary to **presumed** chokehold and chest compression[,]" was only "[**s**]**omewhat** of an opinion[,] … seeing that **I didn't find any significant anatomical findings during the autopsy**."  *Id.* at 52, 51 (emphasis added); *see also id.* at 57-58 (wherein Dr. Zezulak stated that she had not found any evidence consistent with a chokehold, asphyxiation or chest compression).  Dr. Zezulak explained that the only trauma she found on Zweig's body was a scalp hemorrhage, which could not have caused Zweig's death. *Id.* at 52.

The only eyewitness to the altercation, King, stated that although he believed that he saw DiStefano's "hands [] up around [Zweig's] neck or chest area[,] **I wasn't really sure**." *Id.* at 9 (emphasis added); *see also id.* at 29 (wherein King clarified that "I don't want to say this for sure because … I didn't take the time to assess the situation[,] and I just saw [DiStefano's] hands **in the general area**." (emphasis added)).  At no time did King state that he saw DiStefano choking Zweig.  *See*, *e.g.*, *id.* at 28 (wherein King explained that that DiStefano's "hands were on [Zweig,] but I don't know if [DiStefano] was choking him or not[.]").  Moreover, King testified that (1) he did not see how Zweig had fallen to the ground, *id.* at 27-28; (2) it was "just

seconds before [King] turned around[, *i.e.*, while he was walking in front of Zweig and DiStefano and heard a scuffle,] that [King] went over and … pulled [DiStefano] off" of Zweig, **id.** at 31; and (3) "the longest time that … [DiStefano] could have had his hands on [Zweig] was [] five or six seconds tops." **Id.**

In light of the foregoing testimony, the Commonwealth's case for criminal homicide relied upon only a tenuous inference that DiStefano was the cause of Zweig's death, which is not enough to establish a *prima facie* case. **See Wojdak**, **supra**; **Starry**, **supra** (observing that prosecutorial suspicion and conjecture are not evidence and are unacceptable as such); **see also Commonwealth v. Rementer**, 598 A.2d 1300, 1306 (Pa. Super. 1991) (explaining that "the defendant's conduct must bear a **direct and substantial** relationship to the fatal result in order to impose criminal culpability" for homicide (emphasis added)). Thus, the trial court properly exercised its discretion in granting DiStefano *habeas corpus* relief on the charge of criminal homicide.[12]

_____

[12] We further note that we cannot agree with the Commonwealth's claim that the trial court improperly made credibility findings relative to the evidence presented at the preliminary hearing. Rather, a review of the trial court's Opinion and Order reveals that it was the lack of evidence linking DiStefano to Zweig's death, not an assessment of the credibility/weight of witness testimony, that led the court to grant DiStefano *habeas corpus* relief.

However, concerning the aggravated assault charge against DiStefano, we determine that the Commonwealth, in fact, established a *prima facie* case. The Commonwealth contends that the evidence

> showed that [DiStefano] engaged [Zweig] physically, that [DiStefano] gained [the] advantage in this altercation[,] and ended up on top of [Zweig], that [Zweig] was unconscious when [DiStefano] was pulled off of [Zweig], that [Zweig] suffered a blunt force trauma to his skull during the assault, and that [Zweig] died within hours of the assault.
>
> The Commonwealth vehemently submits that this evidence is more than enough from which to infer that, at minimum, [DiStefano], in attacking and putting his hands around the neck and chest area of [Zweig] while on top of him, acted "recklessly under circumstances manifesting extreme indifference to the value of human life." [18 Pa.C.S.A. § 2702(a)(1).]

Brief for the Commonwealth at 35.

DiStefano counters that no *prima facie* case for aggravated assault was established because:

> [t]here is no evidence that Zweig suffered a serious bodily injury[;] in fact, the only injury reported by Dr. Zezulak was a scalp hemorrhage that was not severe enough to cause death. Absent any evidence of how [DiStefano] and Zweig came to be down on the ground[,] or that [DiStefano] choked or otherwise physically harmed Zweig, [DiStefano] cannot be considered to have attempt[ed] to cause [Zweig,] or have caused [Zweig] serious bodily injury.

Brief for Appellee at 20-21; **see also** Trial Court Opinion and Order, 11/13/17, at 5 (setting forth identical language as DiStefano's above argument in support of its ruling). We disagree.

King recalled (1) observing DiStefano and Zweig arguing and "poking each other[,]" N.T., 4/16/17, at 7-8; (2) turning back around to continue

walking, and then hearing a "scuffle" ensue behind him, *id.* at 8; (3) immediately thereafter, seeing Zweig on his back on the sidewalk, unconscious, with DiStefano kneeling and leaning over his body, *id.* at 8, 29; and (4) observing DiStefano's hands on Zweig's body in the general area of his neck. *Id.* Moreover, though King did not see how Zweig was knocked to the sidewalk, given the fact that DiStefano and Zweig had engaged in a "scuffle" immediately preceding this, it could be reasonably inferred from this evidence that Zweig got knocked to the sidewalk as a result of the altercation. *See Starry*, *supra* (stating that inferences reasonably drawn from the evidence of record that would support a verdict of guilty are to be given effect, and that the Commonwealth can establish a *prima facie* case by wholly circumstantial evidence). Additionally, viewed in a light most favorable to the Commonwealth, DiStefano's conduct met the "recklessness" element of the aggravated assault statute, insofar as it almost assured that Zweig would sustain an injury. *See Patrick*, *supra*. Indeed, Zweig suffered a blunt force scalp hemorrhage from the altercation.[13] Furthermore, after Zweig was knocked to the sidewalk, DiStefano pounced on Zweig, laid his hands on Zweig, and continued the altercation until King pulled DiStefano off, leaving

_____

[13] We determine that the evidence established that Zweig suffered "serious bodily injury." He sustained a scalp hemorrhage, was rendered unconscious, and died shortly after the altercation. *Accord Commonwealth v. Burton*, 2 A.3d 600, 600-01, 603 (Pa. Super. 2010) (*en banc*) (holding that the victim sustained serious bodily injury where he was rendered unconscious from a single blow to the head, his eyes had rolled back into his head, and blood was coming out of his nose and was on the back of his head).

Zweig unconscious. Based on this evidence, the Commonwealth established a *prima facie* case of aggravated assault. **Accord Patrick**, 933 A.2d at 1047 (holding that the Commonwealth established a *prima facie* case for aggravated assault where the defendant made a surprise attack on victim, delivering a single punch to his head that knocked him to the ground, whereupon his head hit the sidewalk, resulting in serious injuries).

Based on the foregoing, we affirm the *Habeas Corpus* Order, in part, insofar as it dismissed the criminal homicide charge against DiStefano. However, we reverse the *Habeas Corpus* Order to the extent that it dismissed the aggravated assault charge, and remand for further proceedings.

Order affirmed in part and reversed in part. Case remanded for further proceedings consistent with this Memorandum. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/18/2018