IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 9 EAP 2020 |
| | : | |
| Appellant | : | Appeal from the Judgment of |
| | : | Superior Court entered on |
| | : | 10/07/2019 at No. 1392 EDA 2017 |
| v. | : | affirming the Order entered on |
| | : | 4/5/2017 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| CARLOS PEREZ, | : | Division, at No. MC-51-CR- |
| | : | 0005268-2017. |
| Appellee | : | |
| | : | ARGUED:  December 1, 2020 |

**OPINION**

**JUSTICE DOUGHERTY**                                      **DECIDED:  April 29, 2021**

We granted discretionary review to determine whether the Superior Court employed the proper standard for evidentiary sufficiency in evaluating the Commonwealth's *prima facie* presentation at a preliminary hearing.  *See Commonwealth v. Karetny*, 880 A.2d 505, 513-15 (Pa. 2005) (Commonwealth need not prove defendant's guilt beyond a reasonable doubt at pre-trial stage; it must put forth sufficient evidence to establish *prima facie* case of guilt, *i.e.,* probable cause to warrant belief the accused committed the offense); *Commonwealth v. Huggins*, 836 A.2d 862, 866 (Pa. 2003) (when determining whether *prima facie* case has been established, evidence must be read in light most favorable to Commonwealth, giving effect to all inferences reasonably drawn from evidence to support a verdict of guilty).  We hold the Superior Court failed to review the evidence in the proper light, and accordingly, we reverse and remand.

**I.**

Appellee was arrested and charged with first-degree murder for the stabbing death of the victim during a physical altercation inside a Philadelphia nightclub (the Bleu Martini) during the early morning hours of August 20, 2016. At a first preliminary hearing conducted on March 22, 2017,[1] Hector Martinez, a friend of the victim, testified he and the victim arrived at the Bleu Martini just before closing, but were permitted to enter after paying a fee to a "bouncer." N.T. Preliminary Hearing, 3/22/17 at 5. Martinez testified he saw appellee wearing a gray shirt sitting at a table approximately four feet from where the victim was dancing with a female in a group. Martinez testified he saw appellee stand up and approach the group, the only "males" in the area were appellee and the victim, and he saw two "bouncers" walk toward them. *Id.* at 8, 9, 25. Martinez testified he then saw the victim walk outside, holding his neck. Martinez followed the victim outside, and saw "blood [] gushing out of his neck." *Id.* at 10. Martinez became enraged, "turned back to go inside of the [c]lub[,]" saw appellee "coming outside, he had the blood on his shirt[;] …It was full of blood." *Id.* at 10, 11. Martinez testified he asked appellee, "What did you do to my friend?" and when appellee "pretended he didn't know what I was saying[,]" Martinez "punched [appellee] in the face and [appellee] went [back] inside the club." *Id.* at 10-11, 20. Martinez testified he assumed appellee was the victim's attacker. *Id.* at 11. On cross-examination, Martinez testified although he saw blood on appellee's shirt, he did not actually see the victim get stabbed. *Id.* at 34.

Following the testimony of Martinez, the Commonwealth introduced a DNA lab report showing that blood samples taken from the front and back of appellee's gray shirt "originated from the same source" and "matche[d]" the victim's DNA, and appellee himself

---

[1] Judge Thomas Gehret adjudicated the first preliminary hearing.

was "excluded as a source" for that blood. *Id.* at 37-38. After the Commonwealth rested, appellee's counsel argued the club was crowded, there were females in the vicinity of the incident, "the witness did not see what happened to [the victim]. He doesn't know if it [was] a male or female that caused the injury[;]" and the witness merely assumed appellee stabbed the victim because appellee "had blood on his shirt[.]" *Id.* at 38. Thereafter, the court stated there was a lack of "evidence that would tie this defendant to the case to hold it for trial[;]" noting "[a]nyone near the defendant [sic], if it is squirting out of his neck, would have gotten blood on them[;] …There is probably blood on a number of people that were around the defendant [sic] with blood squirting out of his neck." *Id.* at 40.[2] The court then asked counsel for the Commonwealth, "Why does it have to be a male that did[ ] it?" *Id.* When counsel answered by repeating the question, the court stated "You can't answer that. Discharged, lack of evidence."[3] *Id.* The court granted the Commonwealth's request to stay the discharge order and the Commonwealth re-filed the charges.

A second preliminary hearing was conducted before a different jurist of the common pleas court on April 5, 2017.[4] At the outset, the court stated it had "read the notes of testimony" from the first preliminary hearing, and noted, "the issue[ ] [here] is not whether or not a crime was committed, I think there is an agreement there was a crime committed, but the identity of the perpetrator is the issue in question." N.T. Preliminary Hearing, 4/5/17 at 9, 15-16. The Commonwealth then called as its first witness Marquis McNair, a "bouncer" who worked security at the Bleu Martini. *Id.* at 19. McNair testified

---

[2] It is unclear whether the court's repeated references to the defendant were at times meant to refer to the victim.

[3] The court also noted Martinez "didn't see anything in the defendant's hands[,]" or witness the "defendant being angry[,]" and the Commonwealth "ha[d] other witnesses that [had] not [been] called[.]" N.T., Preliminary Hearing, 3/22/17 at 40.

[4] Judge Kathryn Streeter-Lewis adjudicated the second preliminary hearing.

he was working "the front door" on the night in question, when a "black guy" and a "Spanish guy" got into a pushing match.[5]  *Id.* at 22, 27.  Appellee was wearing a "gr[a]y shirt."  *Id.* at 31.  McNair testified he and another member of the club's security staff quickly and easily broke up the pushing match between the two men and returned to their stations at the front door.  However, McNair then testified, "like a couple minutes later, the [victim] and [appellee] was at it again."  *Id.* at 34.  The second incident between the men was "worse," and "more aggressive" than the first.  *Id.* at 62-63, 75.  McNair and another security staff member quickly responded to the altercation and had to pry the men apart.  McNair did not see anything in appellee's hands, but saw him make an "arm movement" toward the victim's "neck area."[6]  *Id.* at 76.  Within two seconds after separating the men, as McNair was "right there facing the [victim]" a female screamed "they cut him[.]"  *Id.* at 35, 65, 66.  "At first," McNair thought "nothing of it.  I thought [the victim] just got punched in the face, [but] then he took his hand off his neck and blood was just gushing out."  *Id.*  at 35.  McNair testified he saw the victim "walk[ ] outside … stumble[ ] a little bit and collapse[ ] across the street."  *Id.* at 36.

McNair then began clearing patrons out of the club, and after the premises had been cleared, McNair noticed appellee standing inside a "little doorway" separating the "first bar" from the "second bar."  *Id.* at 38.  At this point, appellee was only wearing a tank-top, and McNair, knowing the "rules [of] the club is [one] must have a shirt on[,]" asked him, "[W]here's your shirt?"  *Id.* at 37, 39.  Appellee answered he left it in the

---

[5] Although McNair made no in-court identifications, it is clear from the context of his testimony that all references to the black male are to the victim and all references to the Spanish male are to appellee.  Accordingly, we substitute "victim" for "black male/guy" and "appellee" for "Spanish male/guy" when quoting or referring to McNair's testimony.

[6] The record appears to show McNair physically demonstrated appellee's action, explaining as he did so, "It was like this, with the arm movement."  N.T. Preliminary Hearing, 4/5/17 at 76.

bathroom because "it got bloody." *Id.* at 39. McNair escorted appellee to the bathroom, where appellee retrieved his gray shirt after "fishing for [it] in the trash bin [ ] on the wall." *Id.* at 40. McNair noticed the shirt was the same gray shirt appellee had been wearing, and that it was bloody. McNair testified he saw no other patrons in the club at that time, so he had appellee sit down in a booth with the shirt draped over appellee's shoulder. McNair later saw appellee sitting in the booth wearing handcuffs and being questioned by police. *Id.* at 41. The Commonwealth introduced a statement McNair gave to police indicating appellee said he "threw [the shirt] out because it was bloody from the fight." *Id.* at 44.[7] McNair was shown a photo of the shirt with blood stains on it and he identified it as the shirt appellee had been wearing and had recovered from the trash can on the night of the crime. *Id.* at 46.

On cross examination, McNair testified that while the "pushing" incidents in the Bleu Martini involved only the victim and appellee, both individuals were part of larger groups concentrated in a small two-booth area of the club. Both those groups consisted of people who were "black, white, Spanish, male [and] female." *Id.* at 53-54. McNair could not give a definitive answer as to the number of people around appellee and the victim, or the specific number of people in each group, but testified the total number of people occupying the small two-booth area in which the incident took place was not "more than 15" and not "less than 5." *Id.* at 55. McNair testified he never saw a weapon and did not hear or see any glass being broken. *Id.* at 63. McNair agreed the "blood came shooting out of [the victim]," and the blood "could have hit whoever was near him." *Id.* at 71-72. McNair additionally testified that the other "bouncer" who helped separate appellee and the victim had gotten blood on his suit. McNair disagreed with defense

---

[7] McNair spoke to police the night of the incident and also gave a formal statement several months later.

counsel's suggestion that the only reason McNair detained appellee was because he didn't have a shirt on, and explained he detained him, in part, because appellee had been "in the pushing match with the [victim]." *Id.* at 72. On redirect examination, McNair acknowledged the lighting in the Bleu Martini was "real dim," but maintained no person other than appellee engaged in any altercation with the victim. *Id.* at 77-78.

The Commonwealth then presented the testimony of Philadelphia Police Officer Charles Stone, who responded to the Bleu Martini with his partner after being "flagged down by a citizen" reporting a fight there. *Id.* at 85. The officers received a call while en route reporting a "male stabbed across from the Bleu Martini [ ] parking lot." *Id.* When the officers arrived, they saw the victim lying on the ground, bleeding heavily from the neck and unable to speak. *Id.* at 85-86. Emergency medical personnel arrived and transported the victim to a hospital, where he later died. *Id.* at 86. Officer Stone testified an "employee[ ] from the Bleu Martini . . . said he had a male inside who was involved in the fight." *Id.* Once inside, the officer "was pointed in the direction of [appellee] … [who] was sitting [in a] booth[,]" ostensibly because he was "involved in the fight[,]" and also because "[h]e owed money on the tab." *Id.* at 87-88, 92, 104. The officer asked appellee whether he was "involved in the fight." *Id.* at 90. Appellee replied "no." *Id.* Officer Stone asked appellee a few more questions regarding what happened, and appellee "then stated . . . he had been hit, but he wasn't in the fight." *Id.* Officer Stone then asked appellee "where his shirt was[.]" *Id.* Appellee retrieved his shirt which was now "tucked behind the seat" in which he had been sitting, and the shirt "had blood on it." *Id.* at 91. Officer Stone asked appellee "how did blood get on [the shirt]?" *Id.* at 92. Appellee replied "when he was fighting . . . he got hit and that's how the blood got on there." *Id.* The Commonwealth marked for identification a statement Officer Stone had given in the case, and the officer confirmed it accurately recorded a report he submitted stating that, "[a]t

first [appellee] said he wasn't involved in the fight, . . . [t]hen he said he was involved in the fight but he got hit by some people, and he didn't know exactly what happened." *Id.* at 94-95.

Following the parties' arguments, the preliminary hearing court found the Commonwealth did not meet its burden to "establish at a *prima facie* level that this defendant was the person who inflicted the injuries that resulted in the death of the victim in this case." *Id.* at 115. Thus, the court dismissed the charges for lack of evidence, and the Commonwealth appealed.

A divided *en banc* panel of the Superior Court affirmed.[8] *Commonwealth v. Perez*, 220 A.3d 1069 (Pa. Super. 2019) (*en banc*). The panel majority observed, "'[a] *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and **that the accused is probably the perpetrator of that crime**.'" *Id.* at 1075, *quoting Commonwealth v. Ouch*, 199 A.3d 918, 923 (Pa. Super. 2018) (emphasis supplied by *Perez* court). The panel majority then noted, "[a]t the *prima facie* level, '**inferences reasonably drawn** from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case.'" *Id.*, *quoting Ouch*, 199 A.3d at 923 (emphasis supplied by *Perez* court). The panel additionally observed, "'[e]videntiary inferences, like criminal presumptions, are constitutionally infirm unless the inferred fact is more likely than not to flow from the proved fact on which it is made to depend.'" *Id.*, *quoting Commonwealth v. McBride*, 595 A.2d 589, 591 (Pa. 1991).

---

[8] A three-judge panel of the Superior Court initially quashed the appeal as interlocutory, but pursuant to a properly filed petition, the court granted reargument *en banc*. The majority expression, authored by Judge Lazarus, was joined by three members of the court. Judge Nichols concurred in the result. Judge Olson penned a concurring and dissenting opinion, which was joined by three members of the court.

The court noted the Commonwealth argued "the following evidence" presented at the preliminary hearing provided probable cause to show appellee killed the victim: 1) appellee and the victim engaged in two shoving matches before the victim received his fatal wound; 2) appellee moved his arm toward the victim's neck before the victim was stabbed; 3) appellee attempted to leave the Bleu Martini after the stabbing; 4) appellee twice tried to conceal his bloody shirt; and 5) appellee did not disclose it was the victim's blood on his shirt. *Id.* at 1076.

The panel first addressed the suggested inference that appellee perpetrated the killing based on the testimony provided by McNair. The panel noted although McNair testified appellee made a "furtive arm movement" during the second altercation, which happened around the same time as the stabbing, McNair still was able to physically separate appellee and the victim before hearing a female shout "they cut him," from a surrounding group of "between ten and thirty people." *Id.* at 1077. McNair never saw a weapon and did not see appellee stab the victim, no weapon was ever found, and there was no other evidence to support an inference appellee possessed or used a weapon, such as security video, or "clarifying testimony" from the woman "whose cries brought [the victim's] injury to McNair's attention." *Id.* Viewing this evidence in the light most favorable to the Commonwealth, and "[a]ccepting McNair's testimony as true," the panel concluded, "we are nonetheless unable to find it more likely than not that [the victim's] wound resulted from [appellee's] use of a deadly weapon[.]" *Id.*, *citing, inter alia, Commonwealth v. Prado*, 393 A.2d 8, 10-11 (Pa. 1978) (pre-trial inference of defendant's identity as killer was improper in absence of evidence establishing defendant's actions at time of killing, motive to kill, or murder weapon used).

The panel next rejected the suggested inference of appellee's consciousness of guilt arising from evidence that appellee made efforts to conceal his role in the crime,

because "the record shows [appellee] stayed at Bleu Martini's premises and cooperated with bar security and the police." *Id.* at 1078. The panel noted that, when McNair asked him about his missing shirt, appellee truthfully replied he had discarded the shirt because it had blood on it, and he retrieved the shirt upon McNair's direction. Moreover, the panel emphasized, "[t]he security staff detained [appellee] because of the $600 he owed on his tab, not because they thought he was involved in stabbing [the victim]." *Id.* The panel additionally found no inference of guilt arose from appellee's conversation with Officer Stone, "which, in light of his otherwise cooperative behavior, can hardly be said to have '[misled] the police investigation and to obfuscate his participation in the crime.'" *Id.* at 1079, *quoting Commonwealth v. Calloway*, 459 A.2d 795, 799 (Pa. Super. 1983). The panel opined, "[a]s [appellee] stayed at the scene of the crime, cooperated with club staff, and complied with police, we are unable to find it reasonable to infer [appellee's conduct] betrayed a consciousness of guilt." *Id.* at 1078. Applying the standards set forth in *McBride* and *Ouch*, the panel determined "the law prohibits this [c]ourt from accepting the Commonwealth's inferences as reasonably drawn from the record." *Id.* at 1079. The panel concluded "even read in the light most favorable to the Commonwealth, the evidence before us simply does not permit a finding that [appellee] 'is **probably** the perpetrator of [the] crime.'" *Id.* at 1079, *quoting Ouch*, 199 A.2d at 923 (emphasis supplied by *Perez* court).

Judge Olson would have concluded the "Commonwealth met its burden of establishing a *prima facie* case of murder against [appellee]." *Id.* at 1079-80 (Olson, J., concurring and dissenting). In Judge Olson's view, "the record . . . when viewed in the proper light . . . [shows] there is probable cause to believe that [appellee] was the person who committed [the crime]." *Id.* at 1080. Judge Olson pointed out several inconsistencies in the panel majority's recitation of the facts and the inferences to be reasonably drawn

therefrom. First, the fact no one saw a weapon did not "support[] the conclusion that [appellee] was not the perpetrator." *Id.* at 1084 n.6. In Judge Olson's view, the fact no weapon was seen simply aligned with the evidence establishing it was dark in the club. *Id.* Viewed from the proper perspective, the fact no weapon was seen raised a reasonable inference the perpetrator used some sort of weapon, but "the conditions of the club made it difficult for persons to see." *Id.* Second, Judge Olson opined the majority's conclusion that appellee was "compliant at all times" and was detained **only** "because of the $600 he owed on his tab," ignored Officer Stone's testimony appellee had been detained because he owed money on his tab **and** because he had been "involved in the fight." *Id.* at 1084 n.5 (internal quotation marks omitted and emphasis added). Judge Olson noted that, after appellee retrieved the shirt from the trash at the direction of McNair, appellee later tucked the shirt into the corner of the booth in which he was sitting, permitting a reasonable inference that he removed, discarded and hid the shirt in efforts to conceal evidence. *See id.* at 1085 and n.9. Additionally, Judge Olson noted the fact there was a large amount of the victim's blood on both the front and the back of appellee's shirt raised a reasonable inference that appellee was the person who stabbed the victim in the neck. *Id.* at 1085 n.7.

Judge Olson listed the relevant facts the Commonwealth established in this matter as follows: "[appellee] and [the victim] were engaged in two pushing matches, the second of which was more aggressive; [appellee] and [the victim] were the only two individuals involved in these altercations; [appellee] made a motion toward [the victim's] neck seconds before a female yelled that [the victim] had been cut; [appellee] exited from the club but returned only after being punched by Martinez; [appellee] hid his shirt which contained a significant amount of [the victim's] blood; [appellee] denied being in a fight." *Id.* at 1085. In sum, Judge Olson opined that, viewing the above evidence and all

reasonable inferences therefrom in a light most favorable to the Commonwealth, she would conclude the Commonwealth met its burden of establishing a *prima facie* case that appellee "was **probably** the perpetrator of the crime[.]" *Id.* (emphasis in original).

**II.**

We granted the Commonwealth's petition for allowance of appeal raising the following question: "Did the Superior Court misapply the standard for the evidentiary sufficiency of the Commonwealth's *prima facie* case, as set forth [in *Karetny* and *Huggins*], effectively ruling that inferences may be drawn from the evidence in favor of defendant[s] at the preliminary hearing stage of a criminal proceeding and raising the burden of proof borne by the Commonwealth?" *Commonwealth v. Perez*, 226 A.3d 561 (Pa. 2020) (table) (*per curiam*).

The Commonwealth's bedrock contention is the lower courts deviated from the well-settled and long-accepted "standards by which a court must evaluate a *prima facie* case[,]" which if permitted to stand, will "increase[ ] the Commonwealth's burden of proof at the preliminary hearing stage of litigation." Commonwealth's Brief at 29. "Instead of viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences in the Commonwealth's favor, as required at the preliminary hearing stage by this Court's decisions in [*Karetny*, *supra* and *Huggins*, *supra*], the Superior Court majority and the pretrial courts did just the opposite." *Id.* at 16. The Commonwealth argues that contrary to the conclusions of the lower courts, the evidence it presented, when viewed in the proper light, "unquestionably exceeded the threshold of proving that [appellee] was **probably** the perpetrator of the victim's murder." *Id.* at 18 (emphasis supplied by the Commonwealth).

The Commonwealth asserts the Superior Court rejected the Commonwealth's suggested reasonable inference that appellee was the perpetrator, in large part on the panel's view that "'the second, critical confrontation took place in the midst of between ten and thirty people facing off against one another.'" *Id.* at 20, *quoting Perez*, 220 A.3d at 1077. The Commonwealth asserts the court's factual recitation that there were "between ten and thirty people" in the area shows the panel viewed the evidence and inferences therefrom in appellee's favor, because when asked by defense counsel whether there were "'five, ten, fifteen, people in each group,'" McNair clearly replied "'No.'" *Id.* at 21, *quoting* N.T., 4/5/17 at 54. The Commonwealth contends, if there were two ways to interpret the record evidence on this point; i.e., that there were five to fifteen people **total** in the area where the confrontations took place, or that there were five to fifteen persons in **each group** for a total of ten to thirty altogether, then the court viewed the evidence in the light most favorable to appellee. Moreover, McNair described the number of patrons in that area as not amounting to a "'crowd of people.'" *Id.*, *quoting* N.T. 4/5/17 at 51. Importantly, according to the Commonwealth, "regardless of any quibbles about the precise number of people in the vicinity," the Superior Court simply ignored McNair's testimony that he saw appellee and the victim and no one else involved in the second more serious altercation in which he saw appellee's arm move toward the victim's neck. *Id.* at 22 (additional quotation marks and citations to the record omitted). The Commonwealth also complains the panel majority improperly dismissed McNair's testimony regarding the confrontation because no weapon or surveillance video was introduced to corroborate it; the Commonwealth notes that even under the beyond a reasonable doubt standard, circumstantial evidence tending to corroborate a defendant was the "shooter" is sufficient to establish his or her guilt, despite the fact no murder

weapon was ever discovered. *Id.* at 25, *citing Commonwealth v. Chamberlain*, 30 A.3d 381, 395 (Pa. 2011).

The Commonwealth next claims the Superior Court "disregarded other evidence" favorable to the Commonwealth, namely, that appellee tried to flee the scene and hide evidence which raised a reasonable inference of his consciousness of guilt. *Id.* at 26. According to the Commonwealth, the Superior Court's characterization of appellee's actions as cooperating with Bleu Martini security and the police represents "an improper pre-trial acceptance of defense-favored inferences." *Id.* at 27. The Commonwealth maintains that viewing the facts presented at the preliminary hearing in the light most favorable to the Commonwealth, "as this Court's well-settled precedent requires," leads to the eminently reasonable inference that appellee attempted to conceal evidence and lie to the police, which are both probative of his guilt. *Id.* at 27, *citing Commonwealth v. Dollman*, 541 A.2d 319, 322 (Pa. 1988). Moreover, the Commonwealth suggests the Superior Court's reliance on *Prado*, *supra*, is entirely inapt as that case is factually inapposite. *Id.* at 28-29. The Commonwealth states the defendant in *Prado* was seen simply walking from an alley where a fatal shooting took place, and there were no eyewitnesses to the shooting nor any other evidence whatsoever of the accused's involvement, except an attempt to show motive based on an altercation the accused had with the victim one year earlier. *Id.*

Lastly, the Commonwealth observes a preliminary hearing is not a trial, but is designed to protect an individual's right against an unlawful arrest and detention. *Id.* at 29, *citing McBride*, 595 A.2d at 591. The Commonwealth asserts, "[t]he majority's decision would essentially require the Commonwealth to prove a defendant's guilt beyond a reasonable doubt at the pre-trial stage. Requiring such exacting proof before a

defendant may even be held to stand trial would diminish the Commonwealth's ability to protect society from violent offenders." *Id.*

Appellee agrees a crime occurred and that the central issue in question is the identity of the perpetrator. Appellee's Brief at 7. Appellee first argues that he was not even questioned "about the incident for over six months. The Commonwealth's desperation to repeatedly charge [appellee] in order to put an innocent man on trial is because the case is stone cold." *Id.* at 7-8. Appellee argues there was no direct eyewitness testimony identifying him as "[t]he stabber." *Id.* at 9. Appellee insists the unidentified female's exclamation that "**they** cut him[,]" was insufficient to prove appellee stabbed the victim because "'[t]hey' could be anyone present[,]" and observes "[t]he stabber could have been **any** of the men and women who were all dancing, drinking, and moving around the very small [c]lub." *Id.* (emphasis in original). Appellee next importunes the Commonwealth "would have this Court incorrectly assume that it had to have been a man who stabbed the victim and that the only male in the crowd nearby the victim was [appellee]. In that no one actually saw who stabbed the victim, whose [sic] to say that it was not a woman?" *Id.* at 10 (internal citations omitted). Moreover, appellee is adamant there was "**no** evidence whatsoever that [appellee] 'provoked' either of the two pushing matches[.]" *Id.* at 11 (emphasis in original). Appellee muses that "even if [appellee] and the [d]ecedent were, for the sake of argument, both involved in these pushing matches, that does not establish that it was [appellee] who stabbed the [d]ecedent[,]" as "[t]here is **no** evidence that **anyone** saw [appellee] with any type of weapon in his hand." *Id.* at 12 (emphasis in original).

Appellee goes on in this fashion to argue McNair never testified he saw appellee's "hands on or even near" the victim's neck, and insists the evidence showed that while there was a lot of blood on the floor, and some on a bouncer's suit, "[t]here was only a

small amount of blood on [appellee's] shirt." *Id.* at 12, 14 (emphasis omitted). Appellee insists the shirt was not "'covered' in [appellee's] blood as the Commonwealth alleged and [as] would be expected if [appellee] were in fact the stabber."[9] *Id.* at 14. Appellee characterizes the photograph of the shirt introduced into evidence at the hearing as showing "only" two "approximately fist sized set[s] of spatter[,]" one "mid-chest" and the other "near the right underarm." *Id.* Appellee also insists there is not "any evidence [appellee] attempted to flee the crime scene[,]" and "no attempt on [appellee's] part to conceal, hide or lie about the existence of the bloody shirt[,]" and claims appellee's post-incident behavior was "not evidence of consciousness of guilt." *Id.* at 14-17.

Next, without citation to relevant authority, appellee contends a trial court's "decision to quash a criminal information or indictment is within [the court's] sound discretion . . . and will be reversed on appeal only where there has been a clear abuse of discretion." *Id.* at 17-18.[10] Appellee emphasizes the Commonwealth's evidence was reviewed by two separate common pleas court judges who found the evidence insufficient. The same evidence was reviewed by the Superior Court *en banc*, where a majority of the judges also concluded the evidence was insufficient. Appellee contends, "[w]hile hypothetically perhaps one jurist may misapply or misunderstand the *prima facie* standard, the odds are almost nill [sic] that multiple jurists, viewing that exact same

---

[9] Ignoring the fact this was a preliminary hearing, appellee also complains there was no expert testimony regarding the type of blood spatter to expect from the "internal jugular vein and carotid artery" injury the victim sustained, or as to the manner in which such blood spatter would have appeared "on [appellee's] and the bouncer's shirts[.]" Appellee's Brief at 14 n.6.

[10] Appellee does provide a string cite for cases holding generally that an abuse of discretion is not merely an error in judgment, but represents a manifestly unreasonable judgment, or where the law is misapplied or the record shows there was partiality, prejudice, bias, or ill will. Appellee's Brief at 18.

evidence multiple times, often in consultation with other jurists, would **all** misapply or misunderstand the standard." *Id.* at 19. (emphasis in original).

Appellee finally asserts the inferences drawn from circumstantial evidence must be reasonable, *id.* at 20, *citing McBride*, and observes "'where the Commonwealth's case relies solely upon a tenuous inference to establish a material element of the charge, it has failed to meet its burden of showing that the crime charged was committed.'" *Id.*, *quoting Commonwealth v. Wojdak,* 466 A.2d 991, 997 (Pa. 1983) (emphasis omitted). Appellee argues evidentiary inferences are infirm unless the inferred fact is "'more likely than not'" to flow from the proved fact upon which it depends. *Id.*, *quoting McBride*, 595 A.2d at 591-92. Appellee asserts the more-likely-than-not test must be viewed as a minimum standard; anything less would rise to no higher than suspicion or conjecture, which clearly are not evidence. *Id.* at 21, *citing Wojdak*, 466 A.2d at 966 and *Commonwealth v. Packard*, 767 A.2d 1068, 1071 (Pa. Super. 2001), *abrogated on other grounds*, *Commonwealth v. Dantzler*, 135 A.3d 1109, 1112 n.5 (Pa. Super. 2016). Appellee thus contends there is no proper inference from the evidence to show he is more likely than not the perpetrator. Appellee cites two non-precedential opinions to support his argument that the Commonwealth failed to establish a *prima facie* case and concludes the present case is similarly infirm. *Id.* at 22-24, *citing Commonwealth v. Laboy*, 1950 EDA 2012, slip op. at 7-8 (Pa. Super., May 16, 2013) (unpublished memorandum) and *Commonwealth v. Fuentes*, No. 3927 of 2008, 2009 Pa. Dist. & Cty. LEXIS 376 (Lehigh County, June 2, 2009).

## III.

We have previously observed the "question of the evidentiary sufficiency of the Commonwealth's *prima facie* case is one of law." *Huggins*, 836 A.2d at 865; *see Karetny*,

880 A.2d at 513. Our standard of review over such questions is *de novo* and our scope of review is plenary. *Commonwealth v. McClelland*, 233 A.3d 717, 732 (Pa. 2020). We must determine whether the Superior Court erred in applying these appellate standards, as well as the relevant legal principles pertaining to preliminary hearings.

Pennsylvania law provides:

> The basic principles of law with respect to the purpose of a preliminary hearing are well established. The preliminary hearing is not a trial. The principal function of a preliminary hearing is to protect an individual's right against an unlawful arrest and detention. . . . At this hearing the Commonwealth bears the burden of establishing at least a *prima facie* case that a crime has been committed and that the accused is **probably** the one who committed it.

*Commonwealth v. McBride*, 595 A.2d 589, 591 (Pa. 1991) (citation omitted) (emphasis added).

"[A] *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes probable cause to warrant the belief that the accused committed the offense. Furthermore, the evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to be decided by the jury." *Karetny*, 880 A.2d at 514 (citations omitted). "A judge at a preliminary hearing is not required, nor is he authorized to determine the guilt or innocence of an accused; his sole function is to determine whether probable cause exists to require an accused to stand trial on the charges contained in the complaint." *McBride*, 595 A.2d at 592, *citing Prado*, *supra*. An offense on which the Commonwealth has met its burden will be "held over" for trial, *Commonwealth v. Weigle*, 997 A.2d 306, 311 (Pa. 2010); at the trial, of course, the Commonwealth's burden is to establish guilt beyond a reasonable doubt. *McBride*, 595 A.2d at 591. The weight and credibility of the evidence are not factors at the preliminary hearing stage, and the Commonwealth need only demonstrate sufficient probable cause to believe the person

charged has committed the offense. *Commonwealth v. Wojdak,* 466 A.2d 991, 997 (Pa. 1983) (plurality); *see* also *Huggins,* 836 A.2d at 866 ("A *prima facie* case exists when the Commonwealth . . . establishes sufficient probable cause to warrant the belief that the accused committed the offense."), *citing McBride*, *supra* and *Wojdak, supra.*

"[I]nferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." *Huggins*, 836 A.2d at 866 (quotation marks omitted). "The use of inferences is a process of reasoning by which a fact or proposition sought to be established is deduced as the logical consequence from the existence of other facts that have been established*." Wojdak*, 466 A.2d at 996. The "more-likely-than-not" test, must be applied to assess the reasonableness of inferences relied upon in establishing a *prima facie* case of criminal culpability. *Id.* The more-likely-than-not test is the minimum standard — anything less rises no higher than suspicion or conjecture. *Id.*


**IV.**

The parties and the courts below all agree the victim was unlawfully killed by a stab wound to the neck. Thus, the Commonwealth properly established the statutory elements of the crime of murder at the *prima facie* level. *See* 18 Pa.C.S. §2502(a),(d) ("criminal homicide constitutes murder of the first degree when it is committed by an intentional killing" defined as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing").

We proceed to the question of whether the evidence was sufficient to show appellee was probably the perpetrator. As we have already noted, this is a legal question, and as such, our appellate courts owe no deference to the preliminary hearing court's

determinations in that regard. *See Karetny*, 880 A.2d at 513 ("[T]he trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial, *prima facie* burden[.]"). Concomitantly, and accordingly, we are not bound by that court's legal determinations regarding whether the facts presented at a preliminary hearing raise a reasonable inference that an accused probably was or was not the perpetrator of a crime.

The first two established facts the Commonwealth relied upon at the preliminary hearing to raise a reasonable inference that appellee was the perpetrator were (1) that appellee and the victim engaged in two shoving matches immediately before anyone noticed the victim's ultimately fatal neck wound, and (2) during the second, more aggressive skirmish, appellee made a motion with his arm toward the victim's neck. The Superior Court panel majority stated it read this evidence in the light most favorable to the Commonwealth and accepted it as true, but it nevertheless determined no reasonable inference of appellee's personal culpability arose therefrom. It is clear that in reaching this conclusion the Superior Court did not hew to the appropriate standard.

Although the Superior Court recognized the victim was killed by a wound that was noticed by eyewitnesses seconds after the second skirmish, it ultimately concluded these facts did not raise a reasonable inference that appellee was the killer. The majority thus failed to view this particular evidence in the light most favorable to the Commonwealth, and instead improperly viewed it in the light most favorable to appellee. *See Huggins,* 836 A.2d at 866 (preliminary hearing evidence must be viewed in light most favorable to Commonwealth; inferences reasonably drawn from evidence that would support guilty verdict must be given effect). Specifically, it appears the Superior Court majority, without expressly saying so, determined the eyewitness evidence did not raise the suggested inference that appellee stabbed the victim, but instead raised an equal, or perhaps more

likely, inference that the victim was stabbed by someone else immediately after the second skirmish ended.[11] However, this alternative inference was **not** supported by the evidence when properly viewed in the light most favorable to the Commonwealth, and itself amounted to surmise and conjecture. *Wojdak*, 466 A.2d at 966 (inference below more-likely-than-not standard applicable to evaluating preliminary hearing evidence amounts to surmise and conjecture).

First, the evidence regarding the timing of the fatal thrust, even given McNair's testimony that he did not see the victim get stabbed, was that he saw blood gush from the victim's neck within two seconds of separating the men while he was directly in front of the victim and looking at him. A reasonable inference from this evidence, when viewed in the light most favorable to the Commonwealth, is not that someone else stabbed the victim, but that appellee stabbed the victim. Second, the panel's statement there were between ten and thirty people "facing off against one another," *Perez*, 220 A.3d at 1077, clearly arises from the panel's failure to view the evidence in the light most favorable to the Commonwealth, as its witness McNair testified there were **five to fifteen people total** among the two groups in the vicinity of the altercation. Importantly, there was zero evidence the groups were engaged in hostilities or a face-off against one another at the time the second confrontation between appellee and the victim occurred. It is thus clear the Superior Court majority failed to apply the proper standard. *See Huggins*, 836 A.2d at 866 ("[i]nferences reasonably drawn from the evidence of record which would support

---

[11] We deduce this alternative view from the majority's stated reasons for concluding the evidence was insufficient to raise the Commonwealth's suggested inference: enough time passed after the arm movement for McNair to separate the men; within two seconds after the separation a woman screamed "they cut him;" no weapon was ever recovered, and the "second, critical confrontation took place in the midst of between ten and thirty people facing off against one another." *Perez*, 220 A.3d at 1077.

a verdict of guilty are to be given effect[.]") (quotation marks omitted; brackets in original).[12]

The remaining facts upon which the Commonwealth relied to support its suggested reasonable inference that appellee was the perpetrator were: 1) he attempted to leave the Bleu Martini after the stabbing; 2) he twice tried to conceal his bloody shirt; and, 3) he lied to police regarding the blood on his shirt and his involvement in the incident. We reject the Superior Court's position these facts were not adequately established by the record, and we further reject its legal conclusion they were not sufficient to show appellee's "guilty conscience" and give rise to the reasonable inference appellee was the perpetrator of the crime.

The record evidence was clear appellee did, in fact, leave the Bleu Martini shortly after the stabbing. The evidence was just as clear appellee went back inside the Bleu Martini only after encountering the victim's friend, Martinez, who punched appellee in the face. Although the Superior Court recited these facts, the court interpreted them to mean appellee "stayed at Bleu Martini's premises[,]" which somehow undermines a consciousness of guilt. *Perez*, 220 A.3d at 1078. Thus, when the Superior Court concluded this demonstrated appellee's "cooperat[ion]," *id.*, rather than his flight from the scene, the court failed to view the evidence in the proper light. *See Huggins*, 836 A.2d at 866 (preliminary hearing evidence must be viewed in light most favorable to Commonwealth; inferences reasonably drawn from evidence that would support guilty verdict must be given effect). Additionally, the panel determined the evidence showed that after appellee came back inside the Bleu Martini, "[t]he security staff detained [him] because of the $600 he owed on his tab, not because they thought he was involved in

---

[12] Of course we do not hold that **reasonable** opposing inferences can never arise from a single set of facts, but this clearly was not the case with the evidence of the size and behavior of the groups at the time of the stabbing.

stabbing [the victim]." *Perez*, 220 A.3d at 1078. This also reflects not only a misstatement of the facts, but a failure to view the evidence in a light most favorable to the Commonwealth: in fact, McNair testified appellee was detained in part because he had been involved in the altercation with the victim, and Officer Stone testified appellee was detained because of an outstanding bar tab **and** because of his involvement in the altercation with the victim. *See Huggins*, *supra*; N.T., 4/5/17 at 72, 92, 104.

Additionally, the parties and the courts below all acknowledge appellee discarded his bloody shirt in the trash after he returned to the Bleu Martini. The panel did not view this fact as supporting a reasonable inference that appellee attempted to destroy or conceal evidence, because appellee eventually told McNair where the shirt was and retrieved it at McNair's direction. *Perez*, 220 A.3d at 1078. Thus, the panel actually disregarded the fact appellee initially threw his shirt with appellee's blood on it in the trash. And, the panel apparently ignored evidence that, although appellee had the shirt draped over his shoulder when McNair first seated him in a booth after all other patrons had left the club, the shirt was no longer draped on his shoulder when Officer Stone interviewed appellee a short time later. When Officer Stone asked appellee where the shirt was, appellee retrieved it from where it was tucked behind him in the booth. This preliminary hearing evidence, when viewed in the proper light, reasonably gives rise to an inference that appellee twice attempted to discard or conceal his bloody shirt. The Superior Court's alternate view — that these facts instead demonstrate appellee's compliant behavior — arises from a reading of the evidence in a light most favorable to appellee, not the Commonwealth. *See Karetny*, *supra*; *Huggins*, *supra*.

Finally, and perhaps most telling, the preliminary hearing evidence showed appellee denied he had been involved in a fight when directly asked that question by Officer Stone. After producing the bloody shirt at the officer's direction and further

questioning, appellee admitted he got into a fight, and explained there was blood on the shirt because appellee himself had been hit, thus implying the blood on his shirt was his own. Appellee then appeared to back off the assertion by stating he got hit, but didn't know what happened. But the panel, again failing to apply the proper standard to the evidence, determined that "[w]hile DNA evidence later showed it to be [the victim's] blood on [appellee's] shirt, [appellee] offered an extremely limited answer to Officer Stone, which, in light of his otherwise cooperative behavior, can hardly be said to have misled the police investigation and obfuscate his participation in the crime." *Perez*, 220 A.3d at 1079 (quotation marks and brackets omitted).

**V.**

We conclude the Superior Court failed to apply the correct standards to the evidence presented at the preliminary hearing. Specifically, the court did not view the evidence in a light most favorable to the Commonwealth, and the court also failed to give effect to all reasonable inferences from that evidence that would support a guilty verdict. *See Karetny*, *supra*; *Huggins*, *supra*. We therefore reverse the decision of the Superior Court and order appellee be held for trial.

Reversed and remanded.

Chief Justice Baer, and Justices Saylor, Todd, Donohue, Wecht and Mundy join the opinion.

Justice Saylor files a concurring opinion in which Justice Todd joins.